JARDEL CO., INC., and John A. Robbins Co., Inc., Defendants Below, Appellants,

v.

Kathleen HUGHES, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 9, 1986.
Decided: March 23, 1987.
Rehearing Denied April 16, 1987.

Victor F. Battaglia (argued), Wayne A. Marvel and Francis S. Babiarz of Biggs & Battaglia, Wilmington, for appellants.

Morton Richard Kimmel (argued), Michael Weiss and Edward B. Carter Jr. of Kimmel, Spiller & Weiss, P.A., Wilmington, for appellee.

Before CHRISTIE, C.J., MOORE and WALSH, JJ.

WALSH, Justice:

This is an appeal from a Superior Court jury verdict awarding $530,000 compensatory and $250,000 punitive damages to an employee of a tenant in a shopping mall who was abducted and raped while leaving her employment. The jury concluded that the plaintiff's injuries were attributable to the combined neglect of the owner of the mall, Jardel Co., Inc., and its parent corporation, John A. Robbins Co., in not provid-

ing adequate security in the mall parking lot. Jardel and Robbins [1] contend that the trial court erred in not directing a verdict in their favor on the issue of liability and in several evidentiary rulings in the course of the trial. Jardel also attacks the jury's award of punitive damages as lacking a sufficient legal predicate. We conclude that while the award of compensatory damages is fully supportable in this case, the Superior Court erred, as a matter of law, in submitting the issue of punitive damages to the jury. Accordingly, we reverse that portion of the Superior Court judgment.

## I

The incident which gave rise to this litigation occurred on July 18, 1980, shortly after 9:00 p.m. The plaintiff, an employee of the Woolco store in the Blue Hen Mall in Dover, left her place of employment at closing time. She proceeded through the interior arcade of the mall with the intention of exiting through the rear entrance of the mall adjacent to the parking lot where her vehicle was located. Near the entrance to the Fox theater, the plaintiff was accosted by two unkempt young men, later identified as Mark Reed and Harry Turner, who had been denied entrance to the theater because Fox personnel believed them intoxicated. When these individuals asked plaintiff for a cigarette, she briefly spoke with them, gave them a cigarette and walked on. Reed and Turner followed the plaintiff to her car, which was parked approximately 50 feet from the mall entrance. When she attempted to enter her car, they forced their way into the vehicle with her and drove away.

After being driven to a remote site adjacent to the mall, the plaintiff was beaten and raped by both assailants. While she was unconscious and lying on the ground, her assailants attempted to run her over with her car and later set fire to the car while she was lying in it. Plaintiff re-

gained consciousness and staggered nude and bloodied onto a nearby highway where a passing motorist found her and took her to a nearby hospital.

Plaintiff remained hospitalized for six days. She was treated for severe contusions to the face and scalp, a cerebral concussion and a permanent fracture of the left infraorbital rim of the skull. This latter injury has resulted in a permanent displacement of her left eye and double vision. In addition to her physical injuries the plaintiff, at the time of trial four years later, still suffered from psychological injuries of a post-traumatic stress disorder type.

The security arrangement at the Blue Hen Mall at the time of this incident involved two separate security firms. During business hours, the mall interior was patrolled by employees of Bennett Security Service, under contract with the Mall Merchants Association, on behalf of the mercantile tenants. At closing time, usually 9 p.m., security became the responsibility of Globe Security Systems, Inc. ("Globe"),[2] whose primary concern was the mall exterior, particularly the parking area.

In April, 1979, John Green, Jardel's mall manager, began discussions of security measures with Rita Rodriguez, at the time Vice-President of both Jardel and Robbins and the person with ultimate authority for security expenditures. Their concern arose from the perception of an increase in littering, loitering and automobile racing in the mall parking lot, and instances of minor theft and damage to automobiles. As a result of these discussions, Rodriguez instructed Green to contact national security companies. Green testified that he was not specifically instructed to seek one guard, but was to inquire about guard "services."

Before soliciting bids from security companies, Green contacted Chief Klenowski of the Dover Police Department to ascertain

---

1. Although there was a determination of joint liability based on Robbins' role in approving Jardel's security plan, a finding sharply contested by the appellants, Jardel as the owner and manager of the mall had primary responsibility for security. Unless the context otherwise re- quires a distinction between the two, the defendants will be referred to jointly as "Jardel."

2. Globe had been joined as a defendant in the Superior Court action but was absolved of liability by the jury's verdict.

the police impression of criminal activity at the mall and secure whatever statistics might be available on the subject. Green was advised that no such information was available because the mall had not been established as a separate statistical grid or unit.

On June 11, 1979, Jardel entered into a contract with Globe for guard services. Although the contract did not specify how many guards Jardel would use, Jardel decided to use one guard for each nightly shift beginning at 9 p.m. Rodriguez made this decision after conferring with Green, who had discussed the manpower requirements with Globe representatives prior to the awarding of the contract. Globe personnel testified that they had suggested to Green during those discussions that the mall exterior was too large for one guard. Green denied receiving a specific recommendation to that effect at that time but did acknowledge that while the contract was in effect Globe requested, on more than one occasion, an increase in the number of guards. Green sought justification from Globe for the additional expense.

The primary reason advanced by Globe personnel for the presence of an additional guard was the lack of radio contact with the Dover police, who had refused to permit direct access to the police radio band by persons who were not sworn police officers. Globe wished to remedy this communications gap by placing, inside the mall, an additional guard who would be in radio contact with the outside guard. The inside guard could then communicate requests for assistance by telephone to the Dover police. Green considered this measure superfluous since the same radio liaison could be effected by already-employed maintenance personnel who remained inside the mall throughout the night.

Green's knowledge of security conditions at the mall was not based entirely upon his contacts with Globe's supervisory personnel. Each day he reviewed the report of the previous night prepared by the Globe employee. He also spoke with Bennett security employees and with various merchants in the mall.

Shortly prior to accosting the plaintiff, her abductors had been denied admission to the Fox movie theater located at the mall entrance because employees of the theater believed them drunk or under the influence of drugs. Fox personnel did not alert security to the problem. Near the time plaintiff was forced into her vehicle in the rear parking lot the Bennett security guard was still on duty inside the mall and the Globe guard was in his patrol vehicle parked outside the Woolco store in the front parking lot.

## II

At trial, Jardel conceded that the plaintiff was the beneficiary of its rental agreement with her employer, and that the attack upon her occurred on leased premises, but claimed that it owed plaintiff no duty to provide security for her safety. Jardel argued at trial, and persists in the argument on appeal, that its duty as a landlord is governed exclusively by The Landlord-Tenant Code, 25 *Del.C.* Part III (the "Code"). Since the Code expressly preempts the common law, the argument runs, it also precludes a claim based on an implied warranty of habitability, *i.e.,* a landlord's duty to provide safe premises. The Superior Court expressly rejected this argument in denying Jardel's motion for a directed verdict at the close of all the evidence and we affirm that ruling.

Jardel's Code argument is based on a narrow reading of 25 *Del.C.* § 5303(a), which requires the landlord at all times during the tenancy to "(2) Provide a rental unit which shall not endanger the health, welfare or safety of the tenants or occupants...." Jardel seeks to limit a landlord's obligation under the quoted language to providing a rental structure free of physical defects, but not free of the risk from the criminal acts of third parties.

The distinction between risks arising from the physical condition of the premises and risks attributable to the conduct of third parties is appropriately drawn and has been recognized in decisions involving claims against landlords. *Goldberg v. Housing Authority of the City of Newark,*

N.J.Supr., 38 N.J. 578, 186 A.2d 291 (1962); *New York City Housing Authority v. Medlin*, N.Y.Civ.Ct., 57 Misc.2d 145, 291 N.Y.S.2d 672 (1968); *aff'd*, N.Y.Supr., App. Div., 64 Misc.2d 857, 316 N.Y.S.2d 149 (1968); *Pippin v. Chicago Housing Authority*, Ill.Supr., 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979). These cases, however, concerned claims by tenants of public housing under local statutes and regulations limiting the general ownership obligations of governmental landlords. More importantly, in each case the claim of the injured party was based on the lack of any security, not on the inadequacy of existing security personnel.

We deem it unnecessary to determine in this case whether the Code requires the landlord to provide security incident to its obligation to provide safe premises. This is not a dispute between landlord and tenant concerning the contractual obligations arising from their expressed relationship, but rather the claim of a third party to whom the landlord extended the expectation of safety by providing a security system over the common areas of the mall. Whether Jardel was required by the Code, or through its lease with Woolco, to provide security in the mall, it voluntarily undertook to provide that security—presumably to render the mall more attractive to its tenants, and their customers and employees.[3] Plaintiff thus assumed the status of a business invitee. Having undertaken to provide a security program, albeit voluntarily, Jardel was obligated to perform the task in a reasonable manner with a view toward the dangers to which the program was directed. *Feld v. Merriam*, Pa.Supr., 506 Pa. 383, 485 A.2d 742, 747 (1984); Restatement (Second) of Torts § 323 (1965). The crucial inquiry is the extent of the danger which a landlord must reasonably foresee.

The primary predicate for liability advanced by the plaintiff at trial and adopted by the Superior Court's instruction to the jury was the standard set forth in Section 344 of the Restatement (Second) of Torts (1965), which provides:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Comment f to section 344 further provides:

Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Jardel disputes the applicability of the Restatement standard to its conduct, in particular the scope of foreseeability the Restatement imposes concerning acts of third parties. Jardel argues that absent some prior indication of a specific criminal

---

**3.** As the Superior Court noted in denying Jardel's motion for a directed verdict, if the Code defined the landlord's duty in this case, the plaintiff would be denied recovery simply because she was an employee of a tenant, while a mere patron who was assaulted under identical circumstances could assert the usual common law claim for negligence based on the same claim of inadequate security.

attack of the type which caused harm to the business invitee, a store owner has no liability for injuries caused by intervening criminal acts of third parties. Thus, the argument runs, in the present case evidence of general criminal activity such as property crimes created no duty to anticipate violent assaultive crimes. Courts which have adopted such a restrictive view of a store owner's obligation of foreseeability have denied recovery on the ground that private enterprises are not required to establish their own police forces to insure the safety of their customers. *See Cook v. Safeway Stores, Inc.*, D.C.Ct.App., 354 A.2d 507 (1976); *Cornpropst v. Sloan*, Tenn.Supr., 528 S.W.2d 188, 197 (1975); *Shipes v. Piggly Wiggly St. Andrews, Inc.*, S.C.Supr., 269 S.C. 479, 238 S.E.2d 167 (1977).

■ We recognize that application of the principle of foreseeability to claims based on nonfeasance—here not anticipating acts of third parties—may prove difficult. *See* Prosser & Keeton, *The Law of Torts*, § 56 (5th ed. 1984); *But see Id.* at 374, n. 10; § 61 at 428, nn. 12–19. To begin with, the primary responsibility for public safety lies with government, not the private sector, and the law should not create a cause of action against a private citizen based on governmental default. Secondly, even the most alert and sophisticated police agencies cannot wholly prevent the infliction of violent acts on innocent citizens, as our crime statistics daily attest. Yet large shopping malls are a commonplace part of modern commercial life. Situated entirely on private property, and embracing a large number of diverse business establishments, they have become multipurposed commercial enclosures. As is true in this case, since they are located entirely on private property, they do not enjoy the benefit of routine police protection, yet they attract the public at large, not all of whom are law abiding.

While Jardel here seeks to be relieved of the obligation to provide security for mall patrons, its policy has been one of formalized security arrangements. It has at least tacitly encouraged the internal security furnished by Bennett and paid for through tenants' funding. Certainly, in its contractual undertakings with Globe, it has recognized a separate need to provide security after 9 p.m. in the exit areas and the parking lot. Having undertaken this security responsibility, the mall owner is charged with anticipating the conduct of all persons who might frequent the mall and, in the language of the Restatement, "give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect against it." Restatement (Second) of Torts § 344 (1965).

■ Jardel's proposed foreseeability standard—limited to specific crimes—is unrealistic. Criminal activity is not easily compartmentalized. So-called "property crimes," such as shoplifting, may turn violent if a chase ensues and, as the evidence in this case indicates, family quarrels may become violent with the risk that deadly weapons may be used. Moreover, the repetition of criminal activity, regardless of its mix, may be sufficient to place the property owners on notice of the likelihood that personal injury, not merely property loss, will result. *Foster v. Winston-Salem Joint Venture*, N.C.Supr., 303 N.C. 636, 281 S.E.2d 36, 40 (1981); *Murphy v. Penn Fruit Company*, Pa.Super., 274 Pa.Super. 427, 418 A.2d 480 (1980); *Nallan v. Helmsley-Spear, Inc.*, N.Y.Ct.App., 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980).

■ We conclude that while a property owner is no more an insurer or guarantor of public safety than are police agencies, there is a residual obligation of reasonable care to protect business invitees from the acts of third persons. We adopt the Restatement standard, which approves the concept that incidents of criminal activity provide a duty to foresee specific criminal conduct. Whether the conduct of a particular property owner meets the standard of reasonable care is, of course, a matter for jury determination. The extent of the security protection provided by Jardel in this case raised a factual issue and the jury was entitled to conclude that under the circumstances, that protection was

an insufficient response to the known history of criminal activity. *Butler v. Acme Markets, Inc.*, N.J.Supr., 89 N.J. 270, 445 A.2d 1141, 1146 (1982).

■ Consistent with its definition of a property owner's limited duty to foresee third-party crimes against business invitees, Jardel claims error in the admission at trial of evidence of mall-based crimes reported to the police. At trial, an officer of the Dover Police Department presented evidence of the number of complaints emanating from the Blue Hen Mall to which police had responded in the two-and-one-half years preceding the incident. Of 394 incidents reported, over ninety percent were property or nonpersonal crimes. The remaining incidents, however, involved a kidnapping at gunpoint, an armed robbery, a sexual molestation, indecent exposures, and purse snatchings, with approximately one-half of these incidents occurring in the mall parking lot.

Jardel also questions the admissibility of this evidence to show foreseeability because Green, its mall manager, was denied access to such information by the Dover Police when he made inquiry in May of 1979 in connection with efforts to gauge the need for additional mall security at that time. Jardel does not contend that it was wholly ignorant of the incidents reported to the Dover Police, since it was the apparent practice of the police to respond to the mall when summoned by mall security personnel, including Globe employees under direct contract with Jardel. These incidents were recorded in daily security reports available to Green.

In view of the standard of foreseeability envisioned by § 344 of the Restatement, we cannot conclude that the crime statistics presented by the Dover Police were misleading or irrelevant. As previously noted, crimes of whatever type and whenever occurring on the premises are part of the circumstantial setting in which security needs are measured. *See Foster v. Winston-Salem Joint Venture*, 281 S.E.2d at 40; *Murphy v. Penn Fruit Company*, 418 A.2d at 483. The Superior Court did not abuse its discretion in admitting such evidence.

### III

Plaintiff joined as defendants both Jardel and its corporate parent, Robbins, on the theory that they shared responsibility for the decisions which dictated the security arrangement at the Blue Hen Mall. At trial, Robbins sought a directed verdict on the ground that the plaintiff had failed to present sufficient evidence to permit a jury to conclude that Robbins shared Jardel's liability. The Superior Court denied the motion for a directed verdict and we agree that the issue of joint responsibility was properly submitted to the jury.

The trial testimony established that while day-to-day management of the mall was the direct responsibility of Jardel as the designated landlord, Robbins exercised direct operational control in several management areas, including security decisions. Jardel and Robbins shared common officers and directors. Faith Robbins, the president of both companies, gave conflicting evidence concerning the direct participation of Robbins in mall management. However, Rita Rodriguez, a vice-president of both companies, was responsible for fiscal decisions affecting the mall, including the decision to employ one security guard in the parking lot area. Her approval was also necessary before Green could designate the number of Globe personnel to be employed.

■ The question of control in a parent-subsidiary context is peculiarly a factual one turning on such factors as decision making, designation of duties, and fiscal approval. *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, S.D.N.Y., 301 F.Supp. 64 (1968); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43, pp. 209–210 (rev. perm. ed. 1974); Annot., *Liability of Corporation For Torts of Subsidiary*, 7 A.L.R.3d 1343 (1966). Given the blurring of fiscal and operational decision making between the two corporate entities here, the jury was entitled to draw the inference that, at least in the area of security arrangements, Robbins exercised a di-

rect voice in the number of guards used by Globe in exterior security.

## IV

 Jardel next complains that the trial court abused its discretion in refusing to exclude from evidence the deposition testimony of Harry Turner and the criminal trial testimony of Mark Reed, the two individuals ultimately convicted of the rape and abduction of plaintiff. Jardel did not object to the form in which the testimony of the perpetrators was presented, instead contending that it was so emotion-laden as to evoke undue sympathy from the jury.

While the testimony recounted the harm inflicted on the victim, and was to that extent cumulative of other extensive testimony presented by plaintiff and her treating physicians, it also described the movements of the perpetrators in the mall and their planning. Such description was clearly material to the question of whether the presence of additional security might have prevented the attack.

In admitting the perpetrators' testimony, the trial court was required to perform the balancing analysis imposed by Rule 403 of the Delaware Rules of Evidence.[4] The record clearly reflects the trial court's consideration of the relevance of such testimony against the risk that it would create prejudicial jury sympathy. We find no abuse of discretion in the decision to admit such evidence.

## V

As to the award of compensatory damages, Jardel challenges only the loss of earning capacity component hereinafter discussed. Indeed, in view of the nature and extent of plaintiff's injuries and the harrowing circumstances in which they were inflicted, the jury's award of $530,000 in compensatory damages is fully supportable. However, Jardel registers a strong objection to the punitive damages award in this case. After a full examination of the record in this case and the controlling law we must agree that the issue of punitive damages should not have been submitted to the jury.

At trial, in conformity with a pretrial ruling that evidence of Jardel's net worth would not be presented until plaintiff established a prima facie case for punitive damages, Jardel moved for a directed verdict on the punitive damages claim at the conclusion of plaintiff's evidence directed to liability.

 If the evidence supported a reasonable inference of conduct meeting the standard justifying punitive damages, the issue of punitive damages was joined and Jardel's motion correctly denied. *Eustice v. Rupert*, Del.Supr., 460 A.2d 507, 509 (1983). However, where the evidence supports no such reasonable inference, the movant must be awarded a directed verdict or judgment as to punitive damages. *Id; Stein v. Diamond State Telephone Co.*, Del.Super., 146 A. 737, 740 (1929). Under this standard, the question of punitive damages, like the issue of negligence which here arose from the same conduct, is ordinarily for the trier of fact. *Eustice*, 460 A.2d at 509. In this unusual case, however, even when construed most favorably for plaintiff, the evidence permitted no reasonable inference that Jardel's conduct was sufficiently outrageous to warrant the imposition of punitive damages.

Because the question of punitive damages in personal injury cases is a recurring source of controversy, and calls for their restriction or elimination are frequent[5], it

---

4. D.R.E. 403 provides:
 RULE 403. EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION OR WASTE OF TIME.
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

5. *See e.g.*, Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U.Chi.L.Rev. 1 (1982); *Roginsky v. Richardson-Merrell, Inc.*, 2d Cir., 378 F.2d 832, 838–841 (1967); Sales & Cole, *Punitive Damages: A Relic That Has Outlived Its Origins*, 37 Vanderbilt L.Rev. 1117 (1984).

is not amiss to examine the fundamental principles which support the assessment of such awards. This inquiry is particularly appropriate and timely since the great bulk of Delaware's recent decisional treatment of the standard involved in punitive damage claims has arisen under the repealed automobile guest statute, 21 *Del.C.* § 6101(a). That statutory standard continues to exist in the premises guest statute, 25 *Del.C.* § 1501, which adopted identical language: "wilful or wanton disregard of the rights of others" as its recovery standard. It is, however, perhaps inexact to apply largely defunct statutory standards to tort claims across the board. *But see Cloroben Chemical Corp. v. Comegys,* Del.Supr., 464 A.2d 887, 891–892 (1983).

■■■ The object and purpose of an award of compensatory damages in a civil case is to impose satisfaction for an injury done. 22 Am.Jur.2d *Damages* § 1, at 13 (1965). In tort actions that satisfaction normally takes the form of an award of monetary damages to an injured plaintiff, with the size of the award directly related to the harm caused by the defendant. Once liability is established, the goal in fixing damages is just and full compensation, with the focus upon the plaintiff's injury or loss.

■■■ Punitive damages are fundamentally different from compensatory damages both in purpose and formulation. Compensatory damages aim to correct private wrongs, while assessments of punitive damages implicate other societal policies. Though the injured plaintiff may receive the punitive damage award, to the extent the plaintiff has already been fully compensated by actual damages, an award of punitive damages is, in a real sense, gratuitous. *Malcolm v. Little,* Del.Supr., 295 A.2d 711, 714 (1972); *Jefferson v. Adams,* Del.Super., 4 Har. 321, 323 (1845); *Whittington v. Philadelphia, B. & W.R. Co.,* Del.Super.,

93 A. 563, 565–66 (1915). An award of punitive damages must therefore subsist on grounds other than making the plaintiff "whole." [6]

The punishment element of punitive damages has long been recognized. The United States Supreme Court noted this aspect of a punitive damages award in *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851):

> It is a well-established principle of the common law, that ... a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff.... By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured.

Discussion of the standards governing awards of punitive or exemplary damages are found in early Delaware cases involving common law claims, generally in the form of jury instructions. *McLane v. Sharpe,* Del.Super., 2 Har. 481, 483–484 (1838); *Jefferson v. Adams,* Del.Super., 4 Har. 321, 323 (1845); *Steamboat Co. v. Whilldin,* Del.Super., 4 Har. 228, 233 (1845); *Bonsall v. McKay,* Del.Super., 1 Houst. 520, 522 (1858); *Williams v. Cleaver,* Del.Super., 4 Houst. 453, 460 (1872); *Hysore v. Quigley,* Del.Super., 32 A. 960, 961 (1892); *Ford v. Charles Warner Co.,* Del.Super., 37 A. 39, 42 (1893); *Naylor v. Ponder,* Del.Super., 41 A. 88, 89 (1895); *Watson v. Hastings,* Del.Super., 39 A. 587, 588 (1897); *Petit v. Colmary,* Del.Super., 55 A. 344, 346 (1903); *Farrow v. Hoffecker,* Del.Super., 79 A. 920, 921 (1906); *Jordan v. Delaware & A. Telegraph & Telephone Co.,* Del.Super., 75 A. 1014, 1017 (1909), *aff'd,* Del.Supr., 78 A. 401 (1910); *Pacelli v.*

---

**6.** The extent of plaintiff's injuries, while not relevant to the question of *whether* recklessness exists, is one of the factors, along with the amount of compensatory damages and the defendant's financial well being, to be considered by the jury in the assessment of the amount of punitive damages to be awarded if defendant's conduct is deemed reckless. This distinction may prove difficult for a jury to grasp and lead to the imposition of punitive damage awards based on sympathy alone. It is essential, therefore, that the Court test the legal sufficiency of such claims where an appropriate motion to that effect has been tendered.

*People's Ry. Co.*, Del.Super., 93 A. 560, 563 (1914); *Whittington v. Philadelphia, B. & W.R. Co.*, Del.Super., 93 A. 563, 565–566 (1915). The common theme underlying the submission of punitive damages claims for jury consideration in such cases was evidence of egregious conduct of an intentional or reckless nature.

■ In recent times, apart from the application of punitive damage standards as a recovery threshold under the automobile and premises guest statutes, the imposition of punitive damages has been sanctioned only in situations where the defendant's conduct, though unintentional, has been particularly reprehensible, *i.e.* reckless, or motivated by malice or fraud. Thus, the imposition of punitive damages is sustainable for persistent distribution of an inherently dangerous product with knowledge of its injury-causing effect among the consuming public, *Cloroben Chemical Corp. v. Comegys*, 464 A.2d at 891–892; *Sheppard v. A.C. and S., Inc.*, Del.Super., 484 A.2d 521, 526–27 (1984), for intentional torts such as wrongful eviction, *Malcolm v. Little*, 295 A.2d at 714, for acts accompanied by malice, *Cf. Gannett Co., Inc. v. Re*, Del.Supr., 496 A.2d 553, 559 (1985); *Guthridge v. Pen-Mod*, Del.Super., 239 A.2d 709, 715 (1967), or for wilful or malicious breaches of contract. *Cf. Casson v. Nationwide Ins. Co.*, Del.Super., 455 A.2d 361, 368 (1982).

■ A majority of jurisdictions now accept that punitive damages serve a dual purpose—to punish wrongdoers and deter others from similar conduct. Minzer, Nates, Kimball & Axelrod, *Damages in Tort Actions*, § 40.12 (1982).[7] This dual purpose is reflected in § 908 of the Restatement (Second) of Torts (1979), which provides in part: "Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future."

The punishment/deterrence rationale underlying punitive damages has caused them to be characterized as civil penalties which serve as a substitute for criminal prosecution for conduct which, though criminal, often goes unpunished by the public prosecutor. *Davis v. Schuchat*, D.C.Cir., 510 F.2d 731, 737–738 (1975).

■ The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous," because of "evil motive" or "reckless indifference to the rights of others." Restatement (Second) of Torts § 908, comment b (1979). Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice. *Id.* It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.

■ As noted above, the outrageous conduct may be the result of an evil motive or reckless indifference. In rough approximation, these terms parallel the wilful and wanton standard of the guest statutes. Each refers to a distinct state of mind, one a conscious awareness, the other a conscious indifference. But each requires that the defendant foresee that his unacceptable

7. It has been commented that this Court, in *Malcolm v. Little*, Del.Supr., 295 A.2d 711, 714 (1972), and *Riegel v. Aastad*, Del.Supr., 272 A.2d 715, 718 (1970), has ruled that punitive damages are allowed only as punishment. Sales & Cole, *Punitive Damages: A Relic That Has Outlived Its Origin*, 37 Vanderbilt L.Rev. 1117, 1128 (1984). In those cases this Court referred only to the punishment purpose, failing to mention the deterrence purpose. This Court did not say, however, that it has rejected the deterrence purpose. Indeed, the validity of both purposes has long been recognized in this State. *Jefferson v. Adams*, Del.Super., 4 Har. 321, 323 (1845); *Hy-sore v. Quigley*, Del.Super., 32 A. 960, 961 (1892); *Watson v. Hastings*, Del.Super., 39 A. 587, 588 (1897); *Petit v. Colmary*, Del.Super., 55 A. 344, 346 (1903); *Farrow v. Hoffecker*, Del.Super., 79 A. 920, 921 (1906); *Whittington v. Philadelphia, B & W.R. Co.*, Del.Super., 93 A. 563, 566 (1915); *Hendrickson v. Continental Fibre Co.*, Del.Super., 140 A. 659, 664 (1927); *Stein v. Diamond State Telephone Co.*, Del.Super., 146 A. 737, 741 (1929); *Guthridge v. Pen-Mod, Inc.*, Del.Super., 239 A.2d 709, 715 (1967). Accordingly, we reject the inference that deterrence is not a purpose to be served in the imposition of punitive damages.

conduct threatens particular harm to the plaintiff either individually or as part of a class similarly situated. We prefer the term "reckless indifference" to the term "wanton," which has statutory roots now largely extinct. However, the sharp distinction, drawn by this Court in *McHugh v. Brown*, Del.Supr., 125 A.2d 583, 585 (1956), is still apt. Wantonness is no more a form or degree of negligence than is wilfulness.[8] Wilfulness and wantonness involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences, while negligence lacks any intent, actual or constructive. *Id.*

The same distinction between reckless and negligent conduct exists under Delaware's Criminal Code. Criminal negligence is defined in 11 *Del.C.* § 231(d) as negligence, albeit in a gross form, while reckless conduct as defined in 11 *Del.C.* § 231(c) connotes a distinctly different state of mind. *Kile v. State*, Del.Supr., 382 A.2d 243, 245 (1978). A reckless state of mind, with its conscious disregard of substantial risks, will support a charge of manslaughter, while criminal negligence, with its lack of perception, however gross, will justify only a charge of criminally negligent homocide. 11 *Del.C.* §§ 631, 632.

 Criminal negligence as defined in 11 *Del.C.* § 231(d) is the functional equivalent of gross negligence as that term is applied as a basis for the recovery of damages for civil wrongs. Gross negligence, though criticized as a nebulous concept, signifies more than ordinary inadvertence or inattention. It is nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm. Stevenson, *Negligence In The Atlantic States*, §§ 11–16 (1954) & Supp. (1975). In Delaware tort law the term "gross negligence" has little significance. Simple negligence suffices for recovery of compensatory damages, and where reckless (wanton) or wilful conduct is required, either as a threshold for recovery, as in claims based on the premises guest statute or as a prerequisite for the recovery of punitive damages, as in this case, even gross negligence will not suffice.[9] The concept of gross negligence continues to find application as a recovery threshold in cases of corporate director liability under the business judgment rule. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 873 (1985), and as an exception to the immunity enjoyed by public officers and employees under the State Tort Claims Act, 10 *Del.C.* § 4001 *et seq. Beck v. Claymont School District*, Del.Super., 407 A.2d 226, 231 (1979), *aff'd*, Del.Supr., 424 A.2d 662 (1980).

There is no contention here that Jardel's conduct was intentional or malicious. Its actions must therefore be tested under the standard of recklessness, *i.e.*, a conscious indifference to the rights of others. When so measured it is clear that the evidence did not suffice for submission to the jury of the issue of punitive damages.

 Two significant elements must be present for recklessness to exist. The first is the act itself, *e.g.* in accident cases the negligent operation of a motor vehicle or aircraft, in a products liability claim the manufacture or distribution of a defective product or, as in this case, the decision to provide limited security in areas to which the public has been invited. The second, crucial element involves the actor's state of mind and the issue of foreseeability, or the perception the actor had or should have had of the risk of harm which his conduct would create. The actor's state of mind is thus vital. *Feld v. Merriam*, Pa.Supr., 506 Pa. 383, 485 A.2d 742, 748 (1984). In reversing an award for punitive damages in

---

8. Hughes did not contend at trial that Jardel's conduct was wilful, and the trial court's instructions on punitive damages was limited to wanton conduct.

9. Certain early Delaware cases suggest that gross negligence will suffice to support an award of punitive or exemplary damages. *See,* *e.g., Steamboat Co. v. Whilldin*, Del.Super., 4 Har. 228, 233 (1845), and equate the concept with recklessness. *Ford v. Charles Warner Co.*, Del.Super., 37 A. 39, 42 (1893). Since these cases fail to make the necessary distinction between two conceptually different forms of conduct we do not deem them authoritative.

an action against a landlord for inadequate security, the court in *Feld* drew the appropriate distinction, which controls here: where the harm to the plaintiff results from the criminal conduct of a third party, the outrageous result should not control the question of whether the landlord was consciously indifferent to the foreseeable risk that a third party would inflict such harm. Similarly, in *Orlando Executive Park, Inc. v. P.D.R.*, Fla.App., 402 So.2d 442 (1981), an award of compensatory damages to a motel occupant assaulted by an intruder was upheld on evidence that the motel owner was negligent in employing only one security guard despite the recommendation of a security service that two to three guards be employed. The court expressly approved, however, the action of the trial court in setting aside an award of punitive damages, concluding that the conduct of the defendants was not "of such egregious nature as to support a punitive damage award." *Id.* at 451.

Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment. In this case, Jardel might reasonably have been on notice concerning the incidents of general criminal conduct occurring in its parking lot. But no incident approaching the magnitude of the kidnapping and rape of the plaintiff had been reported in the thirteen months of the Globe contract. Even those incidents which might be deemed assaultive pale in comparison with the attack on the plaintiff. The previous kidnapping arose in a domestic altercation, and no serious physical injury resulted from any of the previous criminal incidents. It may have been an error in judgment, and thus negligence, for Jardel not to opt for a larger security force, but it can hardly be said that Jardel turned its back on a known risk.

Nor is there a basis for the imposition of punitive damages because Jardel's decision on the number of Globe's guards was based on the cost of the additional guard recommended by Globe. The principal basis for Globe's recommendation of an additional guard was to provide an interior radio contact with Dover police. It is not clear that the presence of another guard *inside* the mall would have been a preventative factor in this situation in which the attack was unobserved by the outside guard. Any decision made by Jardel concerning the size of the Globe guard force was dictated, in part, by financial considerations, as is true of any business expense. An economic decision may be the basis for punitive damages, however, only if the economic cost is intentionally weighed against a perceived risk which includes the reasonable likelihood of the harm which occurred. *Cloroben*, 464 A.2d at 891–892; *Grimshaw v. Ford Motor Co.*, Cal.App., 119 Cal.App.3d 757, 810–816, 174 Cal.Rptr. 348, 382–386 (1981). Here, regardless of the basis for the decision to use one guard, there was insufficient evidence to demonstrate the likelihood of the magnitude of the harm which followed.

Finally, we note the complete absence of any deterrent basis for the imposition of punitive damages in this situation. Violent crime is an unfortunate fact of modern society. The primary responsibility for citizen protection is that of organized police agencies. While mercantile landlords should be encouraged to provide safe premises for their customers and employees, they should not be punished for mere inadequacy as a lesson to other landlords. As this case illustrates, a property owner's duty in this area of the law is not so precisely drawn that flagrant abuses can be easily identified and civilly punished. There is an obvious incentive on the part of every landowner to maintain safe premises, since it is in his own economic interest to do so. It is difficult to envision any large saving to be realized by the failure to employ moderately paid security personnel. We fail to see how the allowance of punitive damages in this case will advance the cost-benefit equation in this area.

## VI

Among the items of compensatory damages which the jury was permitted to consider under instructions from the trial court was plaintiff's claim for future loss of earning capacity. Jardel argues that there was not a sufficient evidential foundation for this claim and that the trial court committed an error of law in permitting the jury to consider it.

At the time of the incident in question, plaintiff had recently graduated from a local high school after pursuing a college preparatory program. She planned to work for a year before entering the University of Delaware. During the course of her rehabilitation, she formed the intention of following a nursing career, primarily out of a feeling of empathy for that profession in its care for persons, like herself, who had suffered severe trauma. To that end she entered the University of Delaware in September, 1983, enrolling in the nursing program. She continued to suffer from a post-traumatic stress disorder and remained under psychiatric treatment at the time of trial in 1985. Her symptoms, some of which persisted more than four years after the incident, included depression, low self-esteem, fear of assault, sleep disturbance, recurrent nightmares, and episodic memory loss. The prognosis for eventual recovery from these conditions was, in the words of her treating psychiatrist, "very guarded." In addition, her permanent double vision disability interferes with a normal downward gaze.

One of plaintiff's treating psychiatrists, Dr. Doyle, questioned whether plaintiff would ever be able to deal with trauma patients because of her inability to form personal relationships or deal with stressful situations. In his view, plaintiff's disability would prevent her from succeeding in all but ministerial occupations, such as retail work in nonstressful situations, and she is ill-suited to the medical profession.

It is now clearly established that loss of earning capacity is a proper element of damages recoverable by permanently injured plaintiffs. Evidence of such injuries, however, even coupled with the nature of plaintiff's occupation, present or fairly anticipated, are not sufficient to justify submission of that issue to a jury. *Henne v. Balick*, Del.Supr., 146 A.2d 394, 396 (1958); *Coles v. Spence*, Del.Supr., 202 A.2d 569 (1964). In addition to these essential elements of proof, there must be evidence presented by persons qualified to give an informed opinion, that the claimed injuries will interfere with the ability of the plaintiff to pursue a specific occupation or profession. *McNally v. Eckman*, Del. Supr., 466 A.2d 363 (1983). The extent of that loss or interference is a matter of argument and thus within the area of jury inference under appropriate instruction. *Id.* at 370.

We conclude that under the decisional standards noted above, a sufficient evidential basis was presented on plaintiff's behalf in this case to warrant submission to the jury of her claim for future loss of earning capacity. Plaintiff's physical and emotional disability were well established by the time of trial and fully substantiated by her treating physician. Plaintiff's career aspirations were the result of her own highly subjective physical and emotional experiences and, to a significant degree, perhaps unrealistic, as Dr. Doyle indicated. We cannot say that the basis for discounting plaintiff's idealistic aspirations was so speculative and conjectural as to foreclose the submission of this issue as a proper element of damage. Accordingly, the trial court did not err in submitting this damage issue to the jury.

## VII

Jardel advances two additional claims of error which are quickly addressed. The first arises from the closing summation of plaintiff's counsel, who in the course of his remarks to the jury stated: "I'm an advocate and I believe in my client and my client's cause...." Upon objection by counsel for Jardel the trial court agreed to instruct the jury to disregard any "personal endorsement of counsel." Such an instruction was given as part of the general instructions to the jury. Jardel claims er-

ror in not giving the cautionary instruction at the time the remarks were made.

 The timing of a cautionary instruction is a matter within the judgment of the trial judge, who is better able to determine whether to engage in fragmented instructions during summation or to include such caution as part of the general instruction. Given the marginally objectionable nature of the remarks here under review, we find no abuse of discretion in failing to give a cautionary instruction at the time the remarks were made. *McNally v. Eckman*, 466 A.2d at 372–73.

 Finally, Jardel contends that the Superior Court's award of costs was unauthorized and, in the alternative, that the court improperly included in the bill of costs, entered under the authority of 10 *Del.C.* § 5101, certain items of expense, including deposition costs and excessive expert witness fees. The Superior Court properly determined that the limitation on the award of costs embraced in Article IV, § 16 [10] of the Delaware constitution had no application here since Robbins was a Pennsylvania corporation with no office in Delaware while Jardel, a Delaware corporation, had a resident office in Dover, and the costs for which reimbursement was sought would have been incurred whether suit had been commenced in either Kent County or New Castle County.

 Jardel did not present to the trial court its objection to the allowance of these costs until it filed its motion for reargument of the trial court's granting of the plaintiff's application. Thus, Jardel's objection to the assessment of specific items of costs appears untimely. Indeed, the trial court's ruling of May 16, 1985, rejecting Jardel's constitutional argument, concludes with the language: "There being no other objections to the plaintiff's bill of costs, the bill is granted."

Even if Jardel's objection to specific allowances is timely it clearly lacks merit.

The decision awarding costs is a matter within the sound discretion of the trial court and we find no abuse of discretion in this case.

In sum, we AFFIRM the judgment of the Superior Court in all respects with regard to the award of compensatory damages against both Jardel and Robbins. We are of the view, however, that, as a matter of law, plaintiff failed to present evidence sufficient to establish a basis for the award of punitive damages. Accordingly, that portion of the judgment awarding punitive damages is REVERSED.

---

10. This provision provides:
 The jurisdiction of each of the aforesaid courts shall be coextensive with the State. Process may be issued out of each court, in any county, into every county. No costs shall be awarded against any party to a cause by reason of the fact that suit is brought in a county other than that in which the defendant or defendants may reside at the time of bringing suit.