# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LEVEL 3 COMMUNICATIONS, LLC    )
   )
        Plaintiff,       )
   )
     v.            )      C.A. No N21C-03-212 CEB
   )
TRI-STATE UNDERGROUND, INC.,    )
   )
        Defendant.     )

Submitted: January 6, 2023
Decided: January 27, 2023

*Upon Consideration of Defendant Tri-State Underground, Inc.'s Motion for Partial Summary Judgment on the Issue of Punitive Damages,*
**GRANTED.**

## MEMORANDUM OPINION

Stephen J. Kraftschik, Esquire and Christina B. Vavala, Esquire, POLSINELLI PC, Wilmington, Delaware; David A. Walton, Esquire, and Sydnie A. Shimkus, Esquire, BELL NUNNALLY & MARTIN LLP, Dallas Texas. *Attorneys for Plaintiff Level 3 Communications, LLC.*

Johnathan L. Parshall, Esquire, and Roger D. Landon, Esquire, MURPHY & LANDON, Wilmington, Delaware. *Attorneys for Defendant Tri-State Underground, Inc.*

**BUTLER, R.J.**

Plaintiff Level 3 Communications, LLC ("Level 3") owns an underground network of cables. This Complaint alleges that Defendant Tri-State Underground, Inc. ("Tri-State") cut through Level 3's cables while boring a new line near Level 3's existing cables. Tri-State says that any damage to Level 3's underground cables was caused either by Level 3's own mismarking the location of its cables or the activities of other diggers. In addition to the usual tort claims, Level 3 seeks punitive damages, which Tri-State seeks to preempt with this motion for partial summary judgment. The Court concludes that even assuming Tri-States negligence in severing the cable, Level 3 is not entitled to punitive damages and therefore Tri-State's motion is **GRANTED.**

## BACKGROUND

### A. The Parties

Level 3 is a Colorado-based global communications provider whose services partially depend on an extensive network of underground conduits and fiber-optic cables.[1] The subject of this litigation is Level 3's underground utility lines located at the intersection of Routes 40 and 72 in Glasgow, Delaware.[2] Tri-State is a

---

[1] Second Revised Pretrial Stipulation ¶ 2, D.I. 61 [hereinafter "Stipulation"].
[2] *Id.*

1

Delaware-based corporation that provides underground contracting services[3] including directional drilling.[4]

## B. The Dig Ticket

Tri-State was hired by Kriss Contracting to perform directional drilling at the Intersection of Routes 40 and 72 in connection with installation of a water main.[5] Prior to the start of drilling, Tri-State submitted a request to Miss Utility[6] to dig in the area (a "Dig Ticket").[7] Per normal protocol, Miss Utility notified all the known utilities in the area of the Dig Ticket, including Level 3.[8] Level 3's lines had been laid years earlier, although they had not yet been activated into service.[9]

---

[3] *Id.*

[4] Directional drilling is a term used to describe boring that goes horizontal through the earth creating small tunnels as opposed to drilling in a straight line vertically down. First, a drill bores a small hole through the earth from point A to point B. After the drill exits the ground at point B, a larger drill head called a back reamer is attached. The back reamer is then pulled back through the tunnel. It creates a bigger hole by rotating to rip out anything in its path. *See* Tr. Of Pretrial Conference at 9:2–10:18, D.I. 44 [hereinafter "Pretrial Conference"]. Inside the drill head is a device that sends a signal to a locating device on the surface. The drills operator uses that locating device to confirm that the drill head remains on course as it bores underground. Tr. Of Dep. Of Richard Hess at 73:7–17, Ex. 2 to Def's Mot. for Summ. J, D.I. 47 [hereinafter "R. Hess"].

[5] Stipulation ¶ 1.

[6] Miss Utility is the name commonly used to refer to Utilities Service Protection Center of Delmarva, Inc. It provides a service that allows excavators to notify underground facility owners prior to the start of any excavation (*i.e.,* drilling, trenching, digging, etc.). *See* Miss Utility, https://www.missutility.net/delaware/ (last visited Jan. 26, 2023).

[7] Pretrial Conference at 33:22–34:7.

[8] *Id.*

[9] *Id.* at 5:22–8:12.

Upon notification of a Dig Ticket, known utilities must mark the underground lines in the vicinity of the Dig Ticket or notify Miss Utility that they do not have cable in the area.[10] Level 3's obligation is to place marks on the ground within 18 inches of its conduit to comply with the Underground Utility Damage Prevention and Safety Act.[11]

Level 3 hired a utility locator to respond to the Dig Ticket.[12] Level 3s contractor either applied fresh paint to mark the path of the conduit or was satisfied that a previous painted marking was sufficient—an issue that is left for the jury to decide. In any event, Tri-State confirmed the marks, and was satisfied that its proposed drill path was viable and did not conflict with the marked utility lines.[13]

## C. Operation of the Directional Drill

Directional drills are controlled using a combination of human input and computers. Inside the drills head is a computerized device called a sonde.[14] The sonde sends a signal up to the human locator on the surface.[15] The locator then follows the drill as it progresses underground.[16]

---

[10] *Id.* at 33:22–34:7.
[11] 26 *Del. C.* § 803(5)(a).
[12] Pretrial Conference at 43:11–44:2.
[13] R. Hess at 58:5–66:11.
[14] *Id.* at 72:13–73:17.
[15] *Id.*
[16] *Id.*

As Tri-State's foreman followed the drill head across the intersection, he marked the drill's progress with dots of white paint.[17] Using the locating device, Tri-State's foreman confirmed that the drill head remained more than twenty-four inches away from Level 3's markings to stay within what Tri-State refers to as the "zone of tolerance."[18] If Tri-State's path crossed any of the utility line markings, it performed spot digging to determine how to safely avoid the utility.[19] For example, Tri-State performed spot digging to determine the depth of a DelDOT well[20] so it could be safely avoided.[21] Tri-State believed it unnecessary to, and in fact did not, conduct any spot digging in relation to any of Level 3's markings as its drill path never crossed over any of those marks.[22]

After drilling an initial borehole across the Intersection, Tri-State attached a "back-reamer" to the drill and pulled it back through the borehole.[23] This increased the diameter of the borehole.[24] As the drill came back to its point of origin, Tri-State found fiber cable on the reamer.[25] This fiber was allegedly from cutting into Level 3's fiber-optic cable.

---

[17] *Id.* 73:18–76:3.
[18] *Id.* at 82:17–84:13, 137:14–18.
[19] R. Hess at 62:9–63:12.
[20] A well is where a series of pipes all come in to one location. *Id.*
[21] *Id.*
[22] *Id.* at 64:2–65:4.
[23] *Id.* at 81:15–82:1.
[24] *Id.*
[25] R. Hess at 85:16–86:13.

Although Tri-State documented this discovery with video tape, it did not report the wire discovery to Miss Utility or Level 3. Tri-State says it is not unusual to find cable in the ground on construction sites;[26] Level 3 says it was their fiber optic cable and they can identify it specifically. Moreover, when Level 3 went to power up its new fiber optic line a few months later, it was able to pinpoint a break in the line to the intersection of Routes 40 and 72.[27]

## D. This Litigation

Level 3 sued Tri-State alleging negligence based on the damage caused to the fiber-optic network. Level 3 alleges that Tri-State failed to comply with the degree of care required when performing work near an underground utility line.[28] Level 3 seeks $536,507.91 in damages, which allegedly represents the "actual" damages to its fiber-optic cable.[29] Level 3 also seeks punitive damages.[30]

Tri-State contends that any damage to Level 3's cable was caused by Level 3 mismarking its own cable's location or by the activities of others.[31] While Tri-State concedes these are issues to be hashed by before a jury, it seeks partial summary judgment as to Level 3's claim for punitive damages.

---

[26] *Id.* at 93:5–14.
[27] Pretrial Conference at 5:22–8:12.
[28] Stipulation ¶1.
[29] *Id.*
[30] Compl. at 6, D. I. 1 [hereinafter "Compl."].
[31] Stipulation ¶ 1.

## STANDARD OF REVIEW

The Court will grant summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[32] In considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-movant.[33] If the movant properly demonstrates an "absence of any genuine issue of fact," the burden shifts to the non-moving party to show that specific facts exist to support their claim.[34]

The purpose of punitive damages is two-fold: (1) to punish wrongdoers and (2) to deter others from engaging in similar conduct in the future.[35] Only where a reasonable inference justifying punitive damages can be drawn from the facts may the issue be submitted to a jury.[36] To make out a case for punitive damages, the record must show evidence from which a reasonable jury might find that the

---

[32] Super. Ct. Civ. R. 56(c).

[33] *E.g.*, *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).

[34] *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979); *Phillips v. Del. Power & Light Co.*, 216 A.2d 281, 285 (Del. 1966).

[35] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).

[36] *See, e.g., id.* ("However, where the evidence supports no such reasonable inference, the movant must be awarded a directed verdict or judgment as to punitive damages."); *Craig v. AAR Realty*, 576 A.2d 688, 697 (Del. Super. 1989) ("In this regard, as the trial judge, I must submit the issue to the jury where a reasonable inference justifying punitive damages can be drawn from the facts."); *Greenlee v. Imperial Homes Corp.* 1994 WL 465556, at *9 (Del. Super. July 19, 1994) ("When the Court construes the facts most favorable for the plaintiffs and the evidence permits no reasonable inference a defendant's conduct is sufficiently outrageous to warrant imposition of punitive damages, summary judgment on punitive damages is appropriate.").

defendant's conduct was far beyond "ordinary" negligence.[37]  To make that determination, the Court must consider "whether the defendant's conduct is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.'"[38]  "Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice."[39]  The decision must result from "a conscious indifference to the decision's foreseeable effect."[40]

## ANALYSIS

### A. Tri-State is entitled to summary judgment on the issue of punitive damages.

The issue here is whether Tri-State's allegedly negligent actions—severing Level 3's underground conduit—and post-accident conduct—not reporting the possible strike to Level 3—could justify an award of punitive damages.  Assuming

---

[37] *Jardel*, 523 A.2d at 530 ("In Delaware tort law the term "gross negligence" has little significance.  Simple negligence suffices for recovery of compensatory damages, and where reckless (wanton) or wilful conduct is required, either as a threshold for recovery, as in claims based on the premises guest statute or as a prerequisite for the recovery of punitive damages, as in this case, even gross negligence will not suffice.").

[38] *Id.* at 529 (citing Restatement (Second) of Torts § 908, comment b (Am. L. Inst. 1979)).

[39] *Id.*

[40] *Id.*; *see also Enrique v. State Farm Mut. Auto. Ins. Co.*, 2009 WL 2215073, at *1 (Del. Super. July 16, 2009) ("A plaintiff must show that the tortfeasor, in the formation of his judgment, consciously ignored the precise harm that resulted, and that the precise harm was reasonably apparent.").

all of this is proved to the satisfaction of a jury, Level 3 has made out a case of mere negligence, not one suitable for punitive damages.

1. **There is no evidence that Tri-State acted with intention or malice when it severed Level 3's cables.**

For punitive damages to be available to a plaintiff, it must show that the tortfeasor acted with intention, malice, or a conscious indifference to a precise foreseeable harm.[41] At the pretrial hearing in July 2022, Level 3 alleged that Tri-State "knowingly and intentionally damaged the [cables]."[42] Level 3 has not produced evidence that Tri-State intentionally caused the damage. Tri-State believed—perhaps erroneously—that its drill head remained parallel to[43] and more than twenty-four inches from[44] all utility markings when tunneling through the ground. There is no evidence that Tri-State harbored some animus against Level 3 from which to infer malicious action. Tri-State may have committed a negligent error, and, assuming it did, that is not grounds for punitive damages.

2. **Tri-State's post-accident conduct does not give rise to an inference of intentionality or conscious indifference.**

Level 3 claims that Tri-State's failure to notify Level 3 or Miss Utility the possible cable strike "gives rise to a reasonable inference of culpable behavior."[45]

---

[41] *Jardel*, 523 A.2d at 529–30.
[42] Pretrial Conference at 21:14–23:7.
[43] R. Hess at 64:2–65:4
[44] *Id.* at 82:17–84:13, 137:14–138:16.
[45] Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 16, D.I. 50 [hereinafter "Pl.'s Resp."].

8

Evidence of how a tortfeasor conducts itself after an incident may be relevant to determine its state of mind during the incident.[46] From post-incident conduct, the Court might glean whether the tortfeasor acted with some intentionality or conscious indifference to the rights of others, or if the actions were merely due to some mistake of judgment.[47]

Level 3 characterizes Tri-State's failure to report the possible strike as a "continu[ation] of its reckless conduct" because it delayed Level 3's ability to repair the utility.[48] But there is testimony in the record that it is not uncommon to find trash fiber in the ground[49] and Tri-State believed its drill head remained more than twenty-four inches from all utility markings.[50] Tri-State's employees testified that they did not observe any signs of outages that suggested the fiber was functioning to

[46] *See Thompson v. Starratt*, 1991 WL 53823, at *1 (Del. Super. Feb. 12, 1991); *Enrique*, 2009 WL 2215073, at *1.

[47] *Compare Thompson*, 1991 WL 53823, at *1 (finding the post-accident conduct of leaving the scene of the accident after hitting a pedestrian with a child in her vehicle, failing to render assistance, and instead going to an appointment, and then to work exhibited "wilful and wonton disregard for human life"), *and Short v. Drewes*, 2006 WL 1743442, at *2 (Del. Super. June 21, 2006) (finding a plea to a criminal statute which requires clear reckless conduct was sufficient to allow punitive damages to be submitted to a jury), *with Enrique*, 2009 WL 2215073, at *1 (distinguishing the post-accident conduct of slowly leaving the scene of a vehicle collision to park in a driveway a mile away as mere negligence from the post-accident conduct in *Thompson*).

[48] Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 16, D.I. 50 [hereinafter "Pl.'s Resp."].

[49] R. Hess at 93:5–14.

[50] *Id.* at 82:17–84:13, 137:14–138:16.

operate a utility in the area.[51]  In fact, Level 3's line was not active at the time of the incident.[52]  So it is not shocking if Tri-State was unaware that the fiber on the reamer was the result of shearing a line, thus triggering a duty to report it.

Further, Tri-State made a video documenting the dig site after the cable was found on the reamer.  The Court would be hard pressed to say a tortfeasor who intentionally or recklessly caused damage to another party would then go and document the evidence of their misdeed.  But the Court can say that Tri-State's post-accident conduct does not militate in favor of an award of punitive damages.

### 3. Prior lawsuits naming Tri-State as a tortfeasor do not create an inference of conscious indifference.

Absent intent or malice, Tri-State's actions may justify punitive damages only if there is evidence of a conscious indifference to Level 3's rights as a utility operator.  In its answering brief on this motion, Level 3 argues that evidence of prior lawsuits involving Tri-State shearing underground cable should be considered to infer that Tri-State acted with conscious indifference in the present case.  The Court is asked to consider two complaints—one filed in 2016[53] and one in 2019[54]—against

---

[51] *Id.* at 99:14–103:12.
[52] Pretrial Conference at 5:22–8:12.
[53] *See* Ex. 1, Pl.'s Resp. [hereinafter "2016 Compl."].
[54] *See* Ex. 2, Pl.'s Resp. [hereinafter "2019 Compl."].

Tri-State.[55]  Both complaints allege that Tri-State negligently damaged underground cables during directional drilling work.[56]

Level 3 relies on *Cloroben Chemical Corp v. Comegys*[57] to make its point.  In *Cloroben*, the Delaware Supreme Court affirmed an award of punitive damages against a chemical company for the distribution of an inherently dangerous drain cleaner that burned the plaintiffs.  There was evidence that the company sold the cleaner with full knowledge that it had previously caused a number of injuries.[58]  Given that the product was dangerous, it was clear that the complained of injuries were caused by the chemical company's packaging and product.  By ignoring the complaints and continuing to package the product in the same unsafe manner, the chemical company's conscious indifference could be inferred, warranting punitive damages.

*Cloroben* is a substantially different case from the matter before this Court.  It involved inherently dangerous substances marketed after direct complaints of its effects had been made to its manufacturer.  Because directional drilling carries with it the risk of cutting existing lines, precautions to avoid it are plentiful and, the Court presumes, usually followed.  That there are occasional mishaps is not unheard of.

---

[55] Pl.'s Resp. ¶¶ 6–7.
[56] *See* 2016 Compl. ¶¶ 10, 18–22; 2019 Compl. ¶¶ 6–17.
[57] 464 A.2d 887 (Del. 1983).
[58] *Id.* at 891–92.

11

Level 3 candidly advised the Court during a pretrial hearing that incidents like this are not uncommon.[59] That such an incident happened and previously resulted in a lawsuit somewhere involving Tri-State does not make Tri-State's error here egregious or wanton to the point of punitive damages.

Further, only the 2016 complaint was filed before Tri-State allegedly damaged Level 3's underground cable.[60] The 2019 complaint was filed six months *after* Level 3's cables were damaged.[61]

The Court concludes that this is a garden variety negligence action with no reason to believe it is anything more. If Tri-State is responsible for shearing Level 3's cable, it should be held accountable for Level 3's losses. No reasonable jury could conclude that Tri-State's conduct was so brazen and reckless as to be considered outrageous, or wanton, or any of the adjectives necessary to elevate the culpability to punitive damages.

---

[59] Pretrial Conference at 10:19–12:13.
[60] The complaint was filed January 8, 2016. *See* 2016 Compl.
[61] The complaint was filed September 20, 2019. *See* 2019 Compl.

**CONCLUSION**

For the foregoing reasons, Tri-State's Motion for partial summary judgment as to Level 3's punitive damages claim is **GRANTED.**

**IT IS SO ORDERED.**

Charles E. Butler, Resident Judge