# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AFFORDABLE AUTOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 15C-05-197 ALR |
| | ) | |
| IRVIN A. DIETERT, | ) | |
| | ) | |
| Defendant. | ) | |

## DECISION AFTER TRIAL

Submitted: March 4, 2016
Decided: March 24, 2016

Josiah R. Wolcott, Esquire, Connolly Gallagher, LLP, Newark, DE, Attorney for Plaintiff Affordable Autos, Inc.

Thomas C. Marconi, Esquire, Losco & Marconi, P.A., Wilmington, DE, Attorney for Defendant Irvin A. Dietert

**ROCANELLI, J.**

Plaintiff Affordable Autos, Inc. filed this action against Defendant Irvin A. Dietert on May 22, 2015, raising claims for replevin and conversion. A non-jury trial took place as scheduled on February 3, 2016 and February 4, 2016. On February 10, 2015, the Court issued preliminary findings of fact and identified outstanding issues of law. The Court gave the parties an opportunity, in lieu of closing arguments at trial, to submit written argument. This is the Court's decision after trial, after considering both parties' submissions.

## I.   <u>THE COURT AS FINDER OF FACT</u>

The Court begins with the fundamental observation that each party bears the burden of proving its claims by a preponderance of the evidence. In this regard, the Court must be mindful that, if the evidence presented by the parties during trial is inconsistent and the opposing weight of the evidence is evenly balanced, then "the party seeking to present a preponderance of [the] evidence has failed to meet its burden."[1]

The Court heard the testimony of witnesses and considered documents submitted as exhibits. As fact-finder, the Court followed the direction that is regularly given to juries when assessing the evidence and the credibility of witness testimony:

---

[1] *Eskridge v. Voshell,* 593 A.2d 589 (Table) (Del. 1991).

I must judge the believability of each witness and determine the weight [to be] given to all trial testimony. I considered each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact, [that] the testimony was contradicted; any bias, prejudice or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony. After finding some testimony conflicting by reason of inconsistencies, I have reconciled the testimony, as reasonably as possible, so as to make one harmonious story of it all. To the extent I could not do this, I gave credit to that portion of testimony which, in my judgment, was most worthy of credit and disregarded any portion of the testimony which, in my judgment[,] was unworthy of credit.[2]

## II.    <u>FINDINGS OF FACT</u>

The property at issue is an 1,800 sq. ft. building with attached 700 sq. ft. building and 10 parking spaces in a fenced-in area at rear of building located at 1027A West 25th Street, Wilmington, Delaware 19802 ("Property") in the City of Wilmington ("City"). The commercial landlord is Defendant Irvin A. Dietert. Over many years, Defendant owned and operated various automotive businesses. More recently, Defendant owned and rented commercial properties.

The commercial tenant is Plaintiff Affordable Autos, Inc. Elizabeth Schiavo is President of Plaintiff, and is responsible for the administrative and compliance functions of the business. Charles Schiavo operates the business of Plaintiff by buying vehicles at auction for the purpose of making a profit by improving certain

---

[2] *See Dionisi v. DeCampli,* 1995 WL 398536, *1 (Del. Ch. June 28, 1995).

vehicles for sale at auction at a higher price by using parts salvaged from other vehicles at auctions. The profit margin for this business model is slim. In order to finance the purchase of vehicles at auction, Plaintiff entered a financing agreement with Automotive Finance Corporation ("AFC"). Plaintiff received a $50,000 line of credit starting on or about August 8, 2014, and the line of credit was increased to $100,000 on or about March 8, 2015.

On or about November 26, 2014, Defendant and Plaintiff signed a lease for the Property ("Lease"). The Lease provided that monthly rent would be $1,900. Upon the start of the Lease, Defendant would deposit a check for $3,800, for the first month's rent and a security deposit. In connection with negotiation of the Lease, the parties discussed use of the Property by Plaintiff, and the Lease specifically states that use of the Property is for "sale of cars and trucks, the repair of cars and trucks, the storage of cars and trucks in all types of condition[.]"[3]

By its terms and per the understanding of the parties, the Lease would be effective upon the granting by the State of Delaware of a car dealership license for Plaintiff at the Property. Plaintiff already had a dealership license at another location, but needed State approval for the license to be transferred to the Property. It was Defendant's responsibility to obtain approval for the variance from the City, which was necessary for the license transfer.

---

[3] Lease para. 2, JX1.

In the meantime, before the Lease became effective, the parties had a verbal agreement for occupancy of the Property by the Plaintiff starting on or about December 11, 2014 for a weekly rate of $425 ("Occupancy Agreement"). Per the Occupancy Agreement, Plaintiff could use and occupy most of the Property, but not the 10 parking spaces in a fenced-in area at the rear of the Property. Weekly rent was due on the Thursday of each week.

Moving into the Property was a significant undertaking by Plaintiff, and required the transfer of equipment, tools, and vehicles in various states of repair and disrepair. Plaintiff paid weekly rent of $425 for the weeks of December 11, 2014 and through January 22, 2015. In or about the third week of January, Defendant secured approval by the City for the variance necessary for transfer of Plaintiff's dealership license to the Property.

Over the course of Plaintiff's occupancy, Defendant became dissatisfied with the condition of the Property. On or about January 22, 2015, Defendant verbally notified Plaintiff that Defendant wanted Plaintiff to vacate the Property. There was no meeting of the minds as to the date on which Plaintiff would vacate the Property. There was no meeting of the minds as to the weekly rent due and owing starting on January 22, 2015.

Sometime in early February 2015, Defendant restated his position that Plaintiff must vacate the Property. Defendant wanted Plaintiff to vacate by March

4

31, 2015. Plaintiff claimed to need several months to vacate the Property. Plaintiff made one additional payment of rent of $1,000.

Defendant sent a letter dated March 19, 2015 to Plaintiff and the letter was received by the son of Mr. and Mrs. Schiavo who signed the certified mail receipt. Neither Mr. Schiavo nor Mrs. Schiavo ever saw the letter. In the letter, Defendant claimed to memorialize an agreement that Plaintiff would vacate the Property by March 31, 2015.

As of March 31, 2015, Plaintiff had not vacated the Property. On or about April 2, 2015, Defendant visited the Property and noted that Plaintiff had still not vacated the Property. According to Defendant, Plaintiff was still running an "ongoing operation" at the Property. Nevertheless, on or about April 2, 2015, Defendant changed at least one lock on the Property with the intention of locking Plaintiff out of the Property. Defendant did not take any legal steps to evict Plaintiff under the Landlord-Tenant Code ("Code").

On or about April 2, 2015 after the lock had been changed, Plaintiff entered the Property. Defendant called the City police who refused to intervene. The parties met at the Property on or about April 2, 2015 in the presence of the police. Defendant understood Plaintiff would vacate no later than April 9, 2015. Plaintiff informed Defendant that Plaintiff needed at least an additional week to vacate the Property. In addition, Plaintiff informed Defendant that it would be impossible to

5

remove four vehicles from the Property by April 9, 2015, but Plaintiff felt he could otherwise reasonably vacate the Property in about a week. The parties agreed to meet one week later, at 10 a.m., on or about April 10, 2015. Defendant understood Plaintiff would have vacated by that date and time. Plaintiff understood the purpose of the April 10th meeting was to discuss a firm timeline for vacating the Property. There was no meeting of the minds as to the date on which Plaintiff would vacate the Property.

The meeting scheduled for April 10, 2015 did not take place. On or about April 10, 2015, Defendant concluded that Plaintiff had vacated the Property and considered all personal property left behind to be abandoned. Plaintiff did not intend to abandon personal property at the Property.

On or about April 10, 2015, Defendant again changed the locks on the Property and made arrangements to dispose of all of Plaintiff's personal property on and adjacent to the Property, including four vehicles and some auto parts. Plaintiff owned the four vehicles. Two of the vehicles were located on the Property; two of the vehicles were located on adjacent property owned by a third-party. When Plaintiff arrived at the Property on April 10, 2015, he could not access the building because the locks had been changed.

On April 10, 2015, Defendant directed National Auto Movers, LLC ("National") to tow all four vehicles, including the two vehicles that were not

located on the Property. Plaintiff was not notified and was not given the opportunity to remove the vehicles. Defendant did not pay to have the four vehicles towed. Rather, it was agreed by Defendant that National would keep any money it received from selling the vehicles.

Defendant paid a property maintenance company to clean the Property and dispose of trash and debris at a cost of $865.73. Plaintiff had not been given an opportunity to clean out the Property before this expense was undertaken by Defendant.

When Plaintiff returned to the Property on or about April 12 or 13, 2015, Plaintiff's four vehicles were no longer on or adjacent to the Property. On April 14, 2015, Plaintiff sent a letter by certified mail to Defendant, which Defendant received on April 16, 2015, requesting, *inter alia*, that Defendant return the vehicles in their exact condition within forty-eight hours. After receiving Plaintiff's letter, Defendant did not contact Plaintiff regarding the location of the vehicles nor did Defendant contact National in an attempt to retrieve the vehicles.

The value of the four vehicles to Plaintiff's business exceeded the value of the vehicles as scrap and exceeded the value for which the vehicles were sold by National ($2,000 total for three of the vehicles and under $1,000 for the fourth vehicle). Specifically, the value of the vehicles to Plaintiff was approximately $35,000, which is the value of the various parts and components.

7

Moreover, Plaintiff suffered an additional economic loss when it could not use the various components to create a two-car hauler which Plaintiff could have used for six months and then sold for $25,000. As a result of the fact that Plaintiff could not access the four vehicles, Plaintiff suffered financial losses, including the inability to sell one of the vehicles at a significant profit, the cancellation of the AFC line of credit, loss of business opportunities, and the waste of thousands of dollars spent to start up Plaintiff's new business model.

As of May 1, 2015, Defendant had rented Property to a new tenant at a rate of $1,600 per month, with a monthly increase of $100 per month until the rent reached the monthly rental rate for the new tenant of $1,800 per month. The new tenant operates an automotive repair shop on the Property.

## III. CONCLUSIONS OF LAW

### A. The tenancy between Defendant and Plaintiff was not lawfully terminated.

Under Delaware law, a lease can be written or oral.[4] The parties had an Occupancy Agreement before the written Lease became effective. Although there are few exceptions,[5] all legal rights, remedies, and obligations under a commercial

---

[4] *See* 25 *Del. C.* § 6102(6) (emphasis added) (defining "rental agreement" as "all agreements, *written or oral*, which establish or modify the terms, conditions, rules, regulations or other provisions concerning the use and occupancy of a rental unit."); 25 *Del. C.* § 5141(22) (same).

[5] *See* 25 *Del. C.* § 5101(b) (". . . and only Chapter 57 of Title 25 [Summary Possession] and Part IV of Title 25 [Commercial Leases] shall have any application to commercial rental agreements.").

lease are typically governed by contract principles.[6] Therefore, to the extent that the Code does not address a disputed issue, general contract law will apply. The Code does not permit a landlord—including a commercial landlord—to unilaterally terminate a lease.[7] Further, Delaware decisional law provides that a contract may only be modified when there is consideration and the consent of *all* the parties.[8] Similarly, a unilateral termination of a contract is a repudiation of that contract, and such a repudiation results in a breach.[9]

In connection with the Occupancy Agreement, there is no evidence that the parties established a termination date.[10] While Defendant and Plaintiff were free to modify their agreement, there is no evidence that Defendant and Plaintiff had a meeting of the minds regarding the termination date of the Occupancy Agreement. Accordingly, neither Plaintiff nor Defendant was free to unilaterally terminate their Occupancy Agreement. Nevertheless, Defendant disposed of Plaintiff's personal

---

[6] *Id.* ("Any rental agreement for a commercial rental unit is excluded from this [] Code. All legal rights, remedies and obligations under any agreement for the rental of any commercial rental unit shall be governed by general contract principles. . .").

[7] *See Carriage Realty Pship v. All-Tech Auto Auto., Inc.*, 2001 WL 1526301, at *8 (Del. Ch. Nov. 27, 2001) ("There is no self-help remedy under Delaware law that allows a landlord to unilaterally declare a lease default and terminate lease rights without a magistrate's order. Unless and until a landlord institutes such a proceeding and wins, and the tenant fails to cure the default, the lease remains valid.").

[8] *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000); *De Cecchis v. Evers*, 174 A.2d 463, 464 (Del. Super. 1961).

[9] *Delaware Fin. Mgmt. Corp. v. Lynch*, 2003 WL 21235314, at *4 (Del. Com. Pl. Apr. 7, 2003).

[10] Moreover, the Lease does not specify a termination date. The Lease provides: "On the last day of the [L]ease as defined by section one (1) [left blank] or on the last day of any renewal or extension of the [L]ease, or upon termination by mutual written agreement, tenant should peaceably surrender the [Property] in as good condition as reasonable and proper use will permit." Lease para. 7, JX 1.

property when Defendant had Plaintiff's four vehicles towed and deprived Plaintiff possession of the Property when Defendant changed the locks. Therefore, without a meeting of the minds with respect to when the tenancy would terminate or when Plaintiff would vacate the Property, Defendant's actions resulted in the unlawful termination of the Occupancy Agreement.

### B. Because Defendant did not have the authority to tow Plaintiff's vehicles, Defendant's actions resulted in a conversion.

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it."[11] One's obligation to refrain from conversion, or wrongfully misappropriating another's property, arises from general tort law and "exists independent of any contractual relationship between the parties."[12] Moreover, under the Code, landlords, including commercial landlords, cannot use the remedy of self-help.[13] Instead, a summary proceeding through the Justice of the Peace Court is the appropriate remedy for landlords in situations where a landlord is owed rent,[14] including where

---

[11] *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

[12] *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *4 (Del. Super. July 25, 2007).

[13] *See Carriage Realty P'ship, Inc.*, 2001 WL 1526301, at *8; *see also* 25 *Del. C.* § 5101(b) (providing that Chapter 57 of Title 25, which deals with summary possession of leased property, is applicable to commercial rental agreements).

[14] *See Drylie v. Woods*, 1991 WL 53434, at *2 (Del. Super. Mar. 18, 1991) (referring to 25 *Del. C.* §§ 5701, 5702(2), 5703(1)).

a tenant has abandoned the property with back rent due,[15] or where a tenant "unlawfully continues in possession of any part of the premises after the expiration of the rental agreement without the permission of the landlord."[16] Accordingly, landlords cannot "unilaterally declare a lease default and terminate lease rights without a magistrate's order. Unless and until a landlord institutes such a proceeding and wins, and the tenant fails to cure the default, the lease remains valid."[17] Once a landlord obtains a final judgment, the magistrate issues a writ of possession and a warrant directed to the constable, which describes the property and commands the officer to put the landlord into full possession of the property.[18] If a tenant fails to remove his personal property from the premises once the writ of possession is executed, the landlord can immediately remove the property and store it for seven days at the tenant's expense.[19] If the tenant fails to claim his property after the seven day period, the property will be deemed abandoned and the landlord can dispose of it without further notice to the tenant.[20]

Defendant wrongfully converted Plaintiff's four vehicles. Defendant unlawfully and unilaterally terminated the Occupancy Agreement, and Defendant had no authority to dispose of Plaintiff's personal property located on the Property,

---

[15] *Id.*

[16] 25 *Del. C.* § 5702(a).

[17] *Carriage Realty P'ship*, 2001 WL 1526301, at *8

[18] *Drylie*, 1991 WL 53434, at *2; 25 *Del. C.* § 5715(a).

[19] 25 *Del. C.* § 5715(e).

[20] *Id.*

including Plaintiff's vehicles. However, even assuming *arguendo* that the Occupancy Agreement was terminated, the Code makes clear that Defendant had no authority to engage in self-help, and instead was required to seek relief from the Court as provided in the Code. At trial, Defendant conceded that he did not take any legal steps to evict Plaintiff. Instead, Defendant unilaterally changed the locks on the Property on two separate occasions—once on April 2, 2015 and again on April 10, 2015—with the intent to lock Plaintiff out of the Property. Then, Defendant unlawfully disposed of Plaintiff's personal property.

This Court is not persuaded by Defendant's argument that Plaintiff abandoned his vehicles on the Property. First, as discussed, the Occupancy Agreement was not lawfully terminated and, therefore, it could not be construed that Plaintiff abandoned the vehicles when Plaintiff was wrongfully deprived of possession of the Property. Second, Chapter 44 of the Motor Vehicle Code details how one should properly dispose of abandoned vehicles;[21] however, Defendant did not comply with this statute. Third, Delaware law permits a reasonable amount of time for a property owner to claim or remove his personal property when it is abandoned or on another's property unlawfully.[22] Nevertheless, although the

---

[21] *See* 21 *Del. C.* § 4401 *et seq.*
[22] *See, e.g.,* 21 *Del. C.* § 4414(b) (emphasis added) ("The fact that a person voluntarily left a vehicle and did not return to remove it within *7 consecutive days* shall be prima facie evidence of the willful abandonment of such vehicle."); *see also* 25 *Del. C.* § 4001(a) (emphasis added) (defining "abandoned personal property" as tangible personal property which the rightful owner has left in the care or custody of another person and has failed to maintain, pay for the storage of,

12

parties agreed that they were to meet on April 10, 2015, Defendant chose to remove Plaintiff's vehicles *on that very day* without discussion with Plaintiff. Importantly, Defendant towed all four of Plaintiff's vehicles, including the two vehicles that were not on the Property, but on adjacent property owned by a third-party. Even if Defendant inaccurately believed he could remove Plaintiff's vehicles that were on the Property, Defendant offered no explanation at trial for removing Plaintiff's two vehicles located on realty not owned by Defendant. Fourth, when Plaintiff contacted Defendant via certified mail on April 14, 2015, demanding that Defendant return Plaintiff's vehicles, Defendant, by his own admission at trial, chose to do nothing to attempt to retrieve Plaintiff's vehicles. Accordingly, Defendant wrongfully utilized self-help, exerted dominion and control over Plaintiff's vehicles, and converted Plaintiff's property.

## IV. DAMAGES

Because the Court has concluded that Defendant is liable for conversion, the Court must determine the amount of damages Plaintiff is to be awarded. Plaintiff argues it should be awarded the value of the vehicles at the time of conversion, the value of the cancellation of its AFC line of credit, punitive damages, and attorney's

---

exercise dominion or control over, and has failed to otherwise assert or declare the ownership rights to the tangible personal property *for a period of 1 year.*"); 25 *Del. C.* § 5715(e) (only permitting a landlord to consider a tenant's personal property abandoned following a writ of execution when landlord has stored the personal property for a period of *seven days*).

fees. Defendant argues that Defendant is entitled to a set-off for Plaintiff's unpaid rent and the funds Defendant spent to clean the Property.

**A. Plaintiff is awarded the value of the vehicles at the time of conversion.**

Generally, the measure of damages for conversion is the value of the property at the time of the conversion with interest.[23] With respect to the value of the vehicles at the time of conversion, the Court accepts the testimony and opinions of Mr. Schiavo and Kevin Garver, a purchaser and seller of Ford vehicles and components who has been in the business for at least ten years. Per the testimony of Mr. Schiavo and Mr. Garver, the approximate value of Plaintiff's vehicles at the time that Defendant towed the vehicles was $35,000, which includes the value of the vehicles' parts and components. Accordingly, Plaintiff is entitled to $35,000.00 for the value of the vehicles at the time of Defendant's conversion plus pre-judgment interest at the legal rate from the date of April 10, 2015 – the date of Defendant's conversion.[24] In addition, Plaintiff is entitled to $25,000.00 for the two-car hauler Plaintiff planned to build from the component parts of the vehicles.

---

[23] *Fintak v. Ridenour*, 1991 WL 113625, at *2 (Del. Super. May 29, 1991); *Deriemer v. Bank of Delaware*, 1991 WL 18073, at *1 (Del. Super. Feb. 1, 1991) (citing *Wyndham, Inc. v. Wilmington Trust Co.*, 59 A.2d 456, 459 (Del. Super. 1948)).

[24] *See Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, at *23 (Del. Super. May 30, 2008) (providing that a successful conversion plaintiff is entitled to pre-judgment interest at the legal rate on conversion damages); *see also Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 909 (Del. Ch. 1999) (internal citations omitted) ("Delaware law is settled that '[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues.' Generally, the legal rate of interest has been used as 'the benchmark for pre-judgment

**B. Plaintiff is not entitled to the value of the cancellation of the AFC line of credit or the loss of any business opportunities.**

Although Plaintiff's AFC credit cancellation was a result of Defendant's conversion, Plaintiff—the party with the burden of proof—has not established it is entitled to damages for the cancellation. Specifically, although Plaintiff's credit line through AFC was $100,000, that value only reflects Plaintiff's ability to borrow money and not an amount of money that Plaintiff actually lost. Moreover, the value of the cancellation of the line of credit is unrelated to the fair market value of the vehicles at the time of their conversion. Similarly, Plaintiff is not entitled to damages for loss of business opportunities because Plaintiff's arguments with respect to the monetary amount of these damages is mere speculation.[25]

**C. Defendant is entitled to a set-off for Plaintiff's unpaid rent; however, Defendant is not entitled to a set-off for expenses to clean the Property.**

Defendant argues that he should be afforded a set-off for Plaintiff's unpaid rent up to April 9, 2015 and for the $865.73 Defendant paid a third-party to dispose of trash and debris on the Property on April 10, 2015. Defendant is not entitled to a set-off for the amount Defendant paid to have the Property cleaned. Although Defendant refers to the Lease, which requires Plaintiff to leave the Property in "as

---

interest.'"); *see also Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *33 (Del. Ch. Mar. 5, 2014).

[25] *See H & H Brand Farms, Inc. v. Simpler*, 1994 WL 374308, at *5 (Del. Ch. June 10, 1994) ("It is well settled under Delaware law that a plaintiff may not recover for damages which are speculative or conjectural.").

15

good condition as reasonable and proper use will permit" at the end of the Lease,[26] the Lease was not yet effective and the Occupancy Agreement was not lawfully terminated. Moreover, Defendant never gave Plaintiff a reasonable opportunity to properly clean the Property before locking Plaintiff out. Defendant should have given Plaintiff an opportunity to deliver the Property in good condition before Defendant expended resources to clean the Property. Accordingly, Defendant is not entitled to any set-off for the expenses he paid to a third-party for removing debris and trash from the Property.

However, Defendant is entitled to a set-off for any unpaid rent by Plaintiff until April 10, 2015, when the tenancy was unlawfully terminated. Plaintiff paid weekly rent of $425 for the weeks of December 11, 2014 through January 22, 2015. Plaintiff then paid an additional $1,000 on March 3, 2015 to Defendant for rent. After Plaintiff delivered the March 3, 2015 check to Defendant, Plaintiff did not make any additional payments. Defendant accepted all of these rental payments.

The record establishes that Plaintiff had paid weekly rent until the date of January 22, 2015. There are eleven (11) weeks from January 29, 2015 (when Plaintiff's subsequent rent payment would be due to Defendant) through April 9, 2015 (when Plaintiff's final rent payment would have been due to Defendant). At

---

[26] Lease para. 7, JX 1.

the rate of $425 per week, which was established by the course of dealing between Plaintiff and Defendant, Plaintiff would owe $4,675 to Defendant for the unpaid rent for eleven (11) weeks. However, because Plaintiff subsequently submitted an additional payment of $1,000, it must be subtracted from the $4,675, which equals $3,675 in the amount of unpaid rent. Accordingly, Defendant is entitled to a set-off for rent due in the amount of $3,675.00.

**D. Plaintiff is entitled to punitive damages.**

Plaintiff argues that it should be awarded punitive damages for Defendant's conversion. Plaintiff alleges that Defendant's conversion was intentional and malicious, particularly where Defendant wrongfully used self-help, towed vehicles not located on the Property, and ignored Plaintiff's April 14, 2015 letter requesting the return of its vehicles. Punitive damages are intended to punish tortfeasors whose conduct was willful or wanton and to prevent others from engaging in similar conduct in the future.[27] Specifically, punitive damages may be awarded when a defendant's conduct is "outrageous" or involves "evil motive" or "reckless indifference to the rights of others."[28] With respect to conversion, punitive damages may be awarded where the conversion involves "ill will, malice, recklessness, wantonness, oppression, insult, willful or conscious disregard of the

---

[27] *See Data Mgmt. Internationale, Inc.*, 2007 WL 2142848, at *5; *see also Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).
[28] *Jardel Co.*, 523 A.2d at 529.

plaintiff's rights, or other aggravating circumstances,"[29] including when a defendant consciously disregards a foreseeable result.[30]

At a minimum, Defendant consciously disregarded Plaintiff's right to its vehicles and Plaintiff's right to be in possession of the Property. Although Defendant was aware of, and agreed to (both verbally and in writing), Plaintiff's specific use of the Property, Defendant became unsatisfied with Plaintiff's use. Although Defendant argues that the parties agreed to terminate the Occupancy Agreement on April 9, 205, Defendant changed the locks to the Property a week earlier, on April 2, 2015, with the intent to keep Plaintiff out of the Property. Then, Defendant again changed the locks on April 10, 2015, thereby unlawfully and unilaterally terminating the tenancy.

Defendant knew that Plaintiff owned the vehicles; however, Defendant chose to have the vehicles towed away and wrongfully engaged in self-help. Defendant had the vehicles towed on the morning of April 10, 2015, the date that the parties agreed to meet. Defendant never gave Plaintiff an opportunity to remove the vehicles. Although Defendant argues that it was reasonable to believe that the vehicles were abandoned because the vehicles looked like "junk," Defendant was aware of Plaintiff's business and that Plaintiff engaged in salvaging vehicles. Plaintiff and Defendant discussed Plaintiff's business model and the

---

[29] *Data Mgmt. Internationale, Inc.*, 2007 WL 2142848, at *5 (internal citations omitted).
[30] *Stickney v. Goldstein*, 2002 WL 31999358, at *14 (Del. Com. Pl. Mar. 14, 2002).

Lease explicitly states, *inter alia*, that Plaintiff can use the Property to store vehicles in "all types of condition."[31]   Therefore, it was not reasonable for Defendant to conclude that the vehicles were abandoned.

Nevertheless, even if Defendant believed that Plaintiff abandoned the vehicles, Defendant was required to avail himself of the formal processes in the Landlord-Tenant Code and potentially the Motor Vehicle Code in removing the vehicles.  Instead, Defendant engaged in wrongful self-help not only with respect to the vehicles that remained on the Property, but also with respect to the two vehicles that were on the property of a third-party.  Importantly, when Defendant was specifically notified that Plaintiff had not abandoned the vehicles on April 16, 2015 after receiving Plaintiff's April 14, 2015 letter, Defendant admittedly did nothing.

Moreover, Defendant was consciously indifferent to a foreseeable result – the destruction of Plaintiff's vehicles.  Defendant had National tow the vehicles without Plaintiff's consent and the vehicles were subsequently either destroyed and sold for scrap metal or sold for parts.  It was foreseeable that the vehicles would be destroyed or otherwise disassembled for parts after putting them into National's possession.  Accordingly, Plaintiff is entitled to punitive damages in the amount of

---

[31] Lease para. 2, JX 1.

19

$20,000.00, which the Court finds reasonably accounts for Defendant's conscious disregard of Plaintiff's property rights.

### E. Each party should bear its own litigation expenses.

Plaintiff requests attorney's fees on the grounds that Defendant's pre-litigation conduct "forced Plaintiff to file this suit" because Defendant ignored Plaintiff's April 14, 2015 letter requesting its vehicles be returned. With respect to attorney's fees, Delaware courts follow the American Rule, which provides that litigants are responsible for their own litigation expenses.[32] There are exceptions to the American Rule, such as when a party has prevailed under a statute that permits fee shifting or when an equitable doctrine is implicated.[33] Further, there is a "bad faith exception," which applies when the non-prevailing party acts in "bad faith, vexatiously, wantonly, or for oppressive reasons."[34] The bad faith exception is only applicable in extraordinary cases because its purpose is to "deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process."[35]

---

[32] *Dover Historical Soc., Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006) ("[T]he American Rule requires that "a litigant must, himself, defray the cost of being represented by counsel."); *see also Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, at *23 (Del. Super. May 30, 2008) (referring to *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996)) (explaining that a prevailing party is response for its own attorney's fees)).

[33] *Segovia*, 2008 WL 2251218, at *23.

[34] *Dover Historical Soc., Inc*, 902 A.2d at 1093 (internal citations omitted).

[35] *Id.* (internal citations omitted).

Plaintiff has not established an exception to the American Rule to warrant an award of attorney's fees. First, the Delaware Superior Court has held that successful claims for conversion do not implicate statutes involving fee-shifting or an equitable doctrine; therefore, an award for attorney's fees is generally not warranted.[36] Second, Plaintiff has not alleged facts that would satisfy the very narrow bad faith exception. For instance, the bad faith exception has been applied in cases where parties have unnecessarily prolonged litigation, falsified records, knowingly asserted frivolous claims, altered testimony, or misled the court.[37] The facts do not suggest that Defendant engaged in conduct that is analogous to the conduct involved in successful claims for attorney's fees under the bad faith exception. If a plaintiff could argue that it should be awarded attorney's fees merely because the defendant's actions or inactions prompted plaintiff to file the suit (as Plaintiff argues), every plaintiff would be successful in its claim for attorney's fees. Accordingly, each party should bear the costs for its own litigation expenses.

## V. CONCLUSION

Plaintiff has proven by a preponderance of the evidence that Defendant wrongfully converted Plaintiff's personal property, unlawfully engaged in self-

---

[36] *See Segovia*, 2008 WL 2251218, at *23 ("In this litigation, Plaintiffs have prevailed on claims of breach of contract and conversion. Neither cause of action implicates a statute that provides for fee shifting or an equitable doctrine that would justify an award of attorneys fees.").

[37] *See Dover Historical Soc., Inc*, 902 A.2d at 1093 (internal citations omitted).

help, and consciously disregarded Plaintiff's rights with respect to its personal property and a foreseeable risk that Plaintiff's personal property would be destroyed. Plaintiff is awarded $35,000.000 for the value of the vehicles at the time of conversion, $25,000.00 for the loss of the two-car hauler Plaintiff planned to build, and $20,000.00 in punitive damages. Plaintiff's damages are reduced by the amount of unpaid rent owed to Defendant in the amount of $3,675.00. Accordingly, Plaintiff's total damages are in the amount of $76,325.00 plus pre-judgment and post-judgment interest at the legal rate.

**NOW, THEREFORE, JUDGMENT SHALL ENTER in favor of Plaintiff Affordable Autos, Inc. and against Defendant Irvin A. Dietert in the amount of $76,325.00 plus pre-judgment and post-judgment interest at the legal rate until paid in full. Each party shall bear its own costs, fees, and expenses.**

**IT IS SO ORDERED this 24th day of March 2016.**

*Andrea L. Rocanelli*

_____

**The Honorable Andrea L. Rocanelli**

22