IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STACIA VICK and<br>CHADWICK VICK, | ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. K17C-09-007 NEP<br>In and For Kent County |
| v. | ) ) ) | |
| DR. NASREEN KHAN, KHAN<br>OBSTETRICS AND GYNECOLOGY<br>ASSOCIATES, P.A., BAYHEALTH<br>INC., BAYHEALTH MEDICAL<br>CENTER, and KENT GENERAL<br>HOSPITAL, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: March 15, 2019
Decided: May 17, 2019

**MEMORANDUM OPINION AND ORDER**

***Upon Khan Defendants' Motion to Strike Plaintiffs' Untimely Motion for
Summary Judgment and Ten Untimely Motions in Limine***
**DENIED**

***Upon Plaintiffs' Motion to Strike Bayhealth's Motion for
Summary Judgment***
**DENIED**

***Upon Khan Defendants' Motion for Partial Summary Judgment on
Informed Consent Claims***
**GRANTED**

***Upon Plaintiffs' Motion for Partial Summary Judgment***
**DENIED**

*Upon Khan Defendants' Motion for Partial Summary Judgment on Plaintiffs'
Medical Negligence Claims in Performance of Hysterectomy and Episiotomy*
**GRANTED**

*Upon Khan Defendants' Motion for Partial Summary Judgment on
Punitive Damages Claims*
**GRANTED**

*Upon Bayhealth's Motion for Summary Judgment*
**GRANTED**


Stacia Vick and Chadwick Vick, Plaintiffs, *Pro se.*

Thomas J. Marcoz, Jr., Esquire and Catherine M. Cramer, Esquire, Marshall, Dennehey, Warner, Coleman & Goggin, for Defendants Nasreen Khan, DO and Khan Obstetrics and Gynecology Associates, PA.

James E. Drnec, Esquire and Katherine J. Sullivan, Esquire, Wharton, Levin, Ehrmantraut & Klein, P.A., for Defendants Bayhealth Medical Center, Inc., Bayhealth, Inc., and Kent General Hospital.


**Primos, J.**

Before the Court are several dispositive motions including (1) a motion for partial summary judgment on the issue of informed consent filed by Defendants Nasreen Khan, DO, and Khan Obstetrics and Gynecology Associates, PA (hereinafter collectively the "Khan Defendants"); (2) a cross-motion for partial summary judgment on the same issue filed by Plaintiffs Stacia Vick and Chadwick Vick (hereinafter "Plaintiffs"); (3) the Khan Defendants' motion for partial summary judgment on Plaintiffs' medical negligence claims regarding performance of a hysterectomy and an episiotomy; (4) the Khan Defendants' motion for partial summary judgment on Plaintiffs' punitive damages claims; and (5) a motion for summary judgment filed by Defendants Bayhealth Inc., Bayhealth Medical Center, Inc., and Kent General Hospital (hereinafter collectively "Bayhealth," and collectively with the Khan Defendants, "Defendants"). Additionally, Plaintiffs and the Khan Defendants have each filed motions to strike for untimeliness. This opinion sets forth the Court's decision on the motions.

The Court will first provide a brief recitation of the facts and procedural history before analyzing the motions to strike and then the dispositive motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts and the relevant procedural history as reflected by the record are, briefly, as follows.

3

Ms. Vick was a patient of Dr. Khan during her pregnancy. Dr. Khan saw Ms. Vick in her office over a six-month period and ultimately delivered Ms. Vick's child at Kent General Hospital on June 11, 2015. Before delivery, Dr. Khan performed an episiotomy on Ms. Vick, but allegedly failed to close the laceration properly.

On June 12, 2015, as a result of postpartum hemorrhaging, Dr. Khan performed an emergency hysterectomy on Ms. Vick. Ms. Vick had allegedly previously signed a consent form on June 9, 2015, providing consent for a hysterectomy in the event of an emergency situation. However, prior to Dr. Khan's performing the procedure, Ms. Vick affirmatively indicated to Dr. Khan that she was not consenting to the procedure. Ms. Vick was allegedly restrained against her will during the procedure.

Plaintiffs filed their complaint on September 6, 2017, and filed an amended complaint on October 2, 2017. Bayhealth filed a partial motion to dismiss (in which the Khan Defendants later joined), arguing that many of the counts alleged in the complaint were time-barred. The Court granted the motion on January 5, 2018, dismissing counts III – VIII of Plaintiffs' amended complaint as time-barred; those counts alleged various tortious actions on Defendants' part, including assault, false imprisonment, intentional and negligent infliction of emotional distress,

4

negligence, and fraud. Defendants conceded that counts I and II were not time-barred, as they are medical negligence claims and Plaintiffs had filed a proper notice of intent, which, pursuant to 18 *Del. C.* § 6856, provided a 90-day tolling period.

On May 3, 2018, Plaintiffs filed a subsequent motion to amend their complaint. Plaintiffs' proposed amended complaint sought to add counts for "Medical Malpractice by fraud, conversion, assault and battery, false imprisonment and intentional infliction of emotional distress" and for "Medical Negligence by invasion of privacy, negligence and negligent infliction of emotional distress." This motion was denied by the Commissioner, who found that the proposed changes to the complaint were superficial and not substantive, and that this Court had previously rejected Plaintiffs' arguments that those claims were proper and had dismissed them. The decision of the Commissioner was subsequently affirmed by this Court in an August 22, 2018, order. Plaintiffs sought interlocutory review of the Court's January 5, 2018, and August 22, 2018, orders. On February 21, 2019, the Delaware Supreme Court denied interlocutory review.

Plaintiffs argue that Dr. Khan lacked consent to perform the emergency hysterectomy and that the hysterectomy and episiotomy were performed negligently. Additionally, Plaintiffs allege that Bayhealth is vicariously liable for

Dr. Khan's acts or omissions and that Bayhealth was directly negligent by assisting Dr. Khan in the performance of the hysterectomy despite a lack of consent. Lastly, Plaintiffs assert claims against all Defendants for punitive damages.

## II. STANDARD OF REVIEW

Generally, when reviewing a motion for summary judgment pursuant to Delaware Superior Court Civil Rule 56, the Court must determine whether any genuine issues of material fact exist.[1] The moving party bears the burden of showing that there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law.[2] Further, the Court must view all factual inferences in a light most favorable to the non-moving party.[3] Therefore, summary judgment will not be granted if it appears that there is a material fact in dispute or that further inquiry into the facts would be appropriate.[4] However, summary judgment may be appropriate where a non-moving party that bears the burden of proof at trial fails to "establish the existence of an element essential to that party's case."[5]

---

[1] Super. Ct. R. 56(c); *Wilmington Trust Co. v. Aetna,* 690 A.2d 914, 916 (Del. 1996).
[2] *Moore v. Sizemore,* 405 A.2d 679 (Del. 1979).
[3] *Alabi v. DHL Airways, Inc.,* 583 A.2d 1358, 1361 (Del. 1990).
[4] *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del. Super. 1962), *rev'd in part on procedural grounds and aff'd in part,* 208 A.2d 495 (Del. 1965).
[5] *Smith v. Haldeman,* 2012 WL 3611895, at *1 (Del. Super. Aug. 21, 2012).

The filing of cross-motions for summary judgment does not alter the summary judgment standard,[6] and

> the existence of cross motions for summary judgment does not act *per se* as a concession that there is an absence of factual issues. Rather, a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its own motion, and does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party. Thus, the mere filing of a cross motion for summary judgment does not serve as a waiver of the movant's right to assert the existence of a factual dispute as to the other party's motion.[7]

## III. DISCUSSION

The Court will begin its analysis by examining the motions to strike filed by Plaintiffs and the Khan Defendants. The Court will then address the Khan Defendants' motion for partial summary judgment and Plaintiffs' cross-motion on the issue of informed consent, followed by the Khan Defendants' motions on certain of Plaintiffs' medical negligence claims and claims for punitive damages. Lastly, the Court will consider Bayhealth's motion for summary judgment.

---

[6] *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001) (citing *Haas v. Indian River Vol. Fire Co.*, 2000 WL 1336730 (Del. Ch. Aug. 14, 2000).
[7] *Total Care Physicians*, 798 A.2d at 1050 (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)).

7

## A. Motions to Strike

This Court previously issued a scheduling order setting forth deadlines for the parties to follow. On November 27, 2018, the Court ordered an extension of the deadlines for dispositive motions and motions *in limine* to February 1, 2019. On February 1, 2019, the Khan Defendants filed multiple motions for partial summary judgment as well as a motion *in limine*. At issue, however, are Plaintiffs' dispositive motion and motions *in limine* and Bayhealth's dispositive motion, none of which were successfully e-filed on or before February 1.

Plaintiffs have asserted that they completed their various motions *in limine* and motion for partial summary judgment by February 1, 2019, but that Ms. Vick was unable to drive and hand-deliver the documents to the Court on that date due to severe weather conditions and poor visibility. Plaintiffs state that "[i]n the face of dangerous, life-threatening weather, and with a toddler present in the vehicle, Plaintiff had to pull over and did not make it to Court prior to its closing." Additionally, Plaintiffs assert that Ms. Vick attempted other means of filing the motions on time, including attempting to e-file them and emailing the Prothonotary's Office, but was unsuccessful in doing so. Ultimately, Plaintiffs submitted their motions to the Prothonotary on the next business day, February 4, 2019, and the documents were e-filed by the Prothonotary on February 5, 2019.

On February 8, 2019, Plaintiffs wrote the Court requesting that their motions be deemed timely and accepted for filing or, in the alternative, that the Court grant an enlargement of time pursuant to Delaware Rule of Civil Procedure 6(b). Defendants have opposed this request,[8] arguing that Rule 6(b) is inapplicable and that they have been prejudiced by the late filings. Specifically, Defendants argue that Plaintiffs' late filings resulted in a shortened amount of time to respond to Plaintiffs' motions.[9]

Pursuant to Delaware Rule of Civil Procedure 6(b), "the Court for cause shown may at any time in its discretion. . . (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect. . . ." Excusable neglect is "that neglect which might have been the act of a reasonably prudent person under the circumstances."[10] Mere negligence or carelessness, absent more, will not constitute excusable

---

[8] Bayhealth has joined in the Khan Defendants' motion to strike.

[9] The Khan Defendants have raised two additional arguments in their brief, both of which are easily disposed of. First, they argue that the Court should not reach the analysis required under Rule 6(b), as Plaintiffs failed to file a formal motion for enlargement of time. The Court finds this argument unconvincing. Plaintiffs submitted a letter to the Court, which was received on February 8, 2019, requesting that the Court treat the electronic filings as timely filed or, in the alternative, enlarge the time for filing. The Court finds this request to be sufficient to warrant an analysis under Rule 6(b), particularly as Delaware public policy favors providing a litigant with his or her day in court. The Khan Defendants also argue that Plaintiffs have repeatedly ignored deadlines in this case, putting the trial date in jeopardy. This argument is similarly without merit and is outside the scope of this motion. Defendants could have alerted the Court or filed motions to strike if they felt they were unduly prejudiced by other untimely submissions.

[10] *Ewing v. Bice,* 2001 WL 880120, at *6 (Del. Super. July 25, 2001) (citing *Cohen v. Brandywine Raceway Assoc.,* 238 A.2d 320, 325 (Del. Super. 1968)).

neglect.[11] Determining the existence of excusable neglect is a matter of judicial discretion.[12] The Court should enlarge the time for filings if the movant has demonstrated good cause, absent bad faith on the part of the movant and undue prejudice to the other parties.[13] The Court should be liberal in granting discretionary extensions, as Delaware public policy favors providing a litigant with his or her day in court.[14]

Here, the Court accepts Plaintiffs' assertions that Ms. Vick made reasonable efforts to file her motions on time but was unable to do so because of severe weather conditions. Plaintiffs have demonstrated good cause for the late filings, and no allegations of bad faith have been raised by Defendants or established before the Court. In addition, the Court finds that Ms. Vick acted in good faith and as a reasonably prudent person by attempting to e-file the motions and reaching out to the Prothonotary's Office for assistance.

Additionally, Defendants have failed to show how they have been unduly prejudiced by the late submissions.[15] Although the response time to Plaintiffs'

---

[11] *Id.*

[12] *Ewing,* 2001 WL 880120, at *6.

[13] *Id.*

[14] *Id. See also Riffel v. Sarter*, 2015 WL 2208809, at *2 (Del. Super. May 1, 2015) (holding that considerations of judicial economy and a preference for resolving issues on their merits warranted allowing plaintiff's late submissions of its dispositive motions).

[15] *Cf. Ewing,* 2001 WL 880120, at *7 (Court found that a four-day delay in service of process was not unduly prejudicial to Defendant, particularly as the omission was not a result of bad faith, but rather of oversight).

motions *in limine*, which had been set in the revised scheduling order, was shortened, Defendants have failed to articulate any specific prejudice other than the shortened response period for the *in limine* motions. Defendants were provided with a full two weeks to respond to the dispositive motions. Moreover, if Defendants felt that there was insufficient time to respond to any of the motions, they could have sought additional time from the Court, but they have failed to do so. Therefore, the Khan Defendants' motion to strike is hereby denied.

For the same reasons, the Court denies Plaintiffs' motion to strike Bayhealth's motion for summary judgment. Bayhealth has demonstrated excusable neglect for its late filing.[16] Moreover, Plaintiffs admitted at the oral arguments on March 15, 2019, that they were not prejudiced by the late submission.

## B. Motions for Partial Summary Judgment on Informed Consent Claim

The Court will next examine the Khan Defendants' motion and Plaintiffs' cross-motion for partial summary judgment as to informed consent. Both parties acknowledge that this issue is at the heart of Plaintiffs' case.[17]

---

[16] Bayhealth established that its counsel's staff submitted the motion to the e-file system on February 1 and believed that it had been successfully e-filed, but that the motion was not docketed due to an apparent technical malfunction of the e-filing system.

[17] The parties agreed on this point at the oral arguments held on March 15, 2019. Moreover, Plaintiffs' own expert has asserted that "this whole case actually resolves not necessarily in the medical care but on the question of consent and performing a procedure without the consent of a patient." Dr. Berry Dep. 15:22-25. However, the Khan Defendants have not requested summary judgment on all of Plaintiffs' claims and conceded at oral argument that the issue of informed consent is not the sole issue involved in the case.

11

Plaintiffs' main contention in support of their motion is that Ms. Vick's refusal of the hysterectomy entitles her to a finding in her favor, irrespective of the underlying circumstances and what Dr. Khan believed was necessary at that time. Dr. Khan testified during her deposition that Ms. Vick refused to consent to the hysterectomy, although she had earlier signed a written consent to the procedure in the event of an emergency. Plaintiffs assert that this concession by Dr. Khan is sufficient for a finding of summary judgment in their favor. Additionally, Plaintiffs argue that Bayhealth is vicariously liable, as Bayhealth employees assisted Dr. Khan in the performance of the hysterectomy despite the absence of consent from Ms. Vick.

The Khan Defendants, on the other hand, argue that in order to make out a *prima facie* case of informed consent under 18 *Del. C.* § 6852, Plaintiffs must prove that the injury alleged involved a nonemergency treatment. According to the Khan Defendants, because Delaware law does not permit recovery under an emergency situation, and because there is no dispute among the experts that Ms. Vick's hemorrhage presented an emergency situation, not only must Plaintiffs' motion for partial summary judgment as to informed consent be denied, but Plaintiffs' informed consent claim fails as a matter of law. The Court, having

12

reviewed the facts and law in question, agrees, and finds that judgment as a matter of law on this issue must be granted in favor of the Khan Defendants.[18]

Delaware law precludes a plaintiff from prevailing on an informed consent claim where the treatment provided arose in the context of an emergency.[19] 18 *Del. C.* § 6852(a) is clear and unambiguous and provides that a plaintiff may not recover damages based upon a lack of informed consent unless "(1) [t]he injury alleged involved a *nonemergency* treatment, procedure or surgery; and (2) [t]he injured party proved by a preponderance of evidence that the health-care provider did not supply information regarding such treatment, procedure or surgery to the extent customarily given to patients . . ." (emphasis supplied).

Additionally, the Delaware Supreme Court has held that Section 6852 should be read in conjunction with the definition of "informed consent" under Section 6801(6).[20] Consequently, in order to prevail on an informed consent claim,

---

[18] The Khan Defendants have made an additional argument pursuant to 16 *Del. C.* § 2510. They argue that pursuant to this statute, Dr. Khan may not be subjected to civil liability, as she was providing life-sustaining treatment in an emergency situation when the existence of an advanced health-care directive was unknown. The Court need not address this issue, as it finds that 18 *Del. C.* § 6852 compels judgment as a matter of law on the informed consent claim.

[19] 18 *Del. C.* § 6852. *Cf. Koch v. Cardiology Consultants, P.A.*, 2008 Del. Super. LEXIS 479, at *4-5 (Del. Super. May 16, 2008) (noting that informed consent claim is allowed only for nonemergency treatment, but denying summary judgment due to unresolved question as to whether plaintiff had received emergency treatment).

[20] *Spencer v. Goodill*, 17 A.3d 552, 554 (Del. 2011). Under 18 *Del. C.* § 6801(6), "informed consent" is defined as "the consent…given after the health care provider has informed the patient…of the nature of the proposed procedure…and of the risks and alternatives to treatment…which a reasonable patient would consider material to the decision whether or not to undergo the treatment. . . ."

13

Plaintiffs must not only establish that the injury, in this case the unwanted hysterectomy, involved a nonemergency procedure, but must also prove that "1) the health care provider [Dr. Khan] failed to provide information about risks and alternatives customarily given to patients; 2) a reasonable person would have considered the undisclosed information material; and 3) plaintiff was injured by a complication that should have been disclosed."[21] A fourth requirement has also been read into the statute whereby the plaintiff must establish ". . . that a reasonable person would not have undergone the medical treatment if properly informed of the risks and alternatives."[22]

Here, Plaintiffs have failed to make out a *prima facie* case under Section 6852 and, thus, the Court need not address the remaining elements under Section 6801(6). It is undisputed that Ms. Vick was in the midst of an emergency situation, and that the hysterectomy was an emergency treatment provided to save Ms. Vick's life. The Khan Defendants have proffered four experts, all of whom have asserted that Dr. Khan was presented with an emergency situation and that the hysterectomy was an appropriate course of action given the circumstances. Similarly, Plaintiffs' sole expert, Dr. Berry, has admitted that Ms. Vick's medical

---

[21] *Goodill*, 17 A.3d at 554.
[22] *Id.* at 555.

condition represented an emergency situation and that Dr. Khan performed the hysterectomy to save Ms. Vick's life:

> Q: Would you agree that Ms. Vick had a massive or severe postpartum hemorrhage?
> A: Yes.[23]
>
> Q: Would you agree that given the amount of blood products that she received, her fibrinogen level, her platelet level and the amount of blood that she had lost that her postpartum hemorrhage was an *emergent* situation?
> A: At the time, yes. Absolutely.[24]
>
> Q: If Dr. Khan did not do the hysterectomy on Ms. Vick, do you believe that it would have increased Ms. Vick's risk of death from bleeding?
> A: I think that certainly some sort of surgical intervention was required, whether it was hysterectomy [sic] or not, if she did not do further surgical intervention there's a high probability that Ms. Vick could have died, yes.[25]

As there is no dispute among the parties that the hysterectomy was an emergency treatment, the law is clear that Plaintiffs' claim must fail under Section

---

[23] Dr. Berry Dep. 43:18-20.

[24] Dr. Berry Dep. 49:22-25, 50:1-2 (emphasis supplied).

[25] Dr. Berry Dep. 67:6-13. The Court notes that most of Dr. Berry's assertions with regard to informed consent pertain to a potential breach of the standard of care. Dr. Berry has asserted that other surgical options or procedures were available to Dr. Khan besides performing the hysterectomy, such as decreasing blood flow to the uterus with "uterine artery ligation or other types of abdominal surgical procedures." However, the question of whether Dr. Khan could or should have chosen another response to the postpartum hemorrhage is irrelevant. Rather, as stated above, the question presented under 18 *Del. C.* § 6852(a)(1) is whether Dr. Khan was faced with a *nonemergency* treatment, procedure or surgery. As all parties have agreed that the answer to this question is "no," and that an emergency existed, the Court need not address what, if any, other options were available to Dr. Khan.

6852(a). Therefore, judgment as a matter of law must be granted in favor of the Khan Defendants on this issue.

### C. The Khan Defendants' Motion for Partial Summary Judgment on Plaintiffs' Medical Negligence Claims Regarding Performance of Hysterectomy and Episiotomy

The Court will next examine the Khan Defendants' motion for partial summary judgment on Plaintiffs' medical negligence claims as to the performance of the hysterectomy and the episiotomy. The Khan Defendants' primary argument in support of their motion is that Dr. Berry testified that he was not critical of the manner or technical performance of the hysterectomy or the episiotomy. Thus, because Plaintiffs have failed to present any expert medical testimony to support their assertions of medical negligence as to these procedures, Plaintiffs' claims allegedly fail as a matter of law.

The Delaware Medical Malpractice Act requires that, in the absence of several exceptions that are inapplicable to this case,[26] a plaintiff's claim for medical malpractice must be supported by expert medical testimony.[27] 18 *Del. C.* § 6853

---

[26] Section 6853 provides that "a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any 1 or more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider."

[27] 18 *Del. C.* § 6853.

provides that "[n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death. . . ." Thus, Section 6853 specifically mandates that before liability can be found in a medical malpractice action, the plaintiff bears the initial burden of presenting expert medical testimony as to (1) the applicable standard of care; (2) the alleged deviation from that standard; and (3) the causal link between that deviation and the alleged injury.[28] Additionally, an expert must testify to a reasonable medical probability as to each of the above elements.[29]

Here, it is clear that Plaintiffs have failed to establish a *prima facie* case of medical negligence as to the performance of the episiotomy or the hysterectomy. First, with regard to the episiotomy, Dr. Berry testified that he is not critical of Dr. Khan for performing the episiotomy or for the method in which the episiotomy was performed or repaired, nor does he believe that the postpartum hemorrhage or bleeding were caused by the performance of the episiotomy.[30] Indeed, neither

---

[28] 18 *Del. C.* § 6853; *Russell v. Kanaga*, 571 A.2d 724, 732 (Del. Super. 1990); *O'Donald v. McConnell*, 858 A.2d 960, at *2 (Del. 2004) (TABLE).

[29] *See Floray v. State*, 720 A.2d 1132, 1136 (Del. 1998) ("Generally when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty.'") (citing *Oxendine v. State*, 528 A.2d 870, 873 (Del. 1987)).

[30] Dr. Berry was asked if he was critical of Dr. Khan for doing an episiotomy on Ms. Vick, to which he responded "[n]o." Dr. Berry Dep. 39:16-18. Dr. Berry was then asked if he was critical of the method in which Dr. Khan performed the episiotomy, to which he also responded in the negative. Dr. Berry Dep. 39:19-23. Lastly, Dr. Berry was asked if he believes the postpartum

Defendants' experts nor Dr. Berry provided any negative testimony as to an alleged deviation from the applicable standard of care in the performance of the episiotomy, or a causal link between that deviation and the alleged injury.[31]

Looking next to the performance of the hysterectomy, Plaintiffs have failed to provide any expert medical testimony to establish liability under Section 6853. Plaintiffs argue that the "technical manner" in which the hysterectomy was performed is irrelevant, as Dr. Khan performed the procedure without consent. However, this is not the law under Section 6853. Rather, as stated above, Plaintiffs bear the initial burden of presenting expert medical testimony as to (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between that deviation and the alleged injury. Here, it is clear that Dr. Berry has not provided any testimony as to these three elements:

> Q: Okay. So you have no criticism of the way that Dr. Khan actually performed the hysterectomy. Is that fair?
> A: That's correct.[32]

---

hemorrhage was a result of the episiotomy, to which he responded "[n]o, I don't think so." Dr. Berry Dep. 50:24-25, 51:1-4.

[31] Plaintiffs attempt to make an argument under the doctrine of *res ipsa loquitur* by asserting that "[t]he fact that Defendants spent one hour repairing an episiotomy that reopened over a month later speaks for itself. There is nothing 'technical' that needs to be analyzed and broken down by a medical expert." This is an incorrect reading of the law. While *res ipsa loquitur* may be used to help make out a *prima facie* case for negligence, it may not be used as a substitute for expert medical testimony under a claim for medical negligence. *Williams v. Dyer*, 1992 WL 240477, at *2 (Del. Super. Aug. 12, 1992).

[32] Dr. Berry Dep. 86:21-23.

Q: Are you going to testify that Dr. Khan negligently performed the hysterectomy?
A: Only as it relates to the absence of consent.
Q: Sure. But in the actual technical performance of it?
A: In the technical performance of it, that [sic] there was no negligence that I can see.[33]

Moreover, Plaintiffs themselves admitted at the oral arguments held on March 15, 2019, that they have no evidence of the hysterectomy's being performed negligently and that their argument pertains to a lack of consent. Therefore, as no party has asserted any criticism of the manner in which Dr. Khan performed the episiotomy or the hysterectomy, it is clear that there are no genuine issues of material fact and that summary judgment must be granted in favor of the Khan Defendants on these issues.

## D. The Khan Defendants' Motion for Partial Summary Judgment on Punitive Damages

The Khan Defendants have filed a motion for partial summary judgment as to Plaintiffs' claims for punitive damages. Plaintiffs filed a complaint on September 8, 2017, and an amended complaint on October 2, 2017, alleging, *inter alia*, that Dr. Khan performed a hysterectomy without Ms. Vick's consent. In both complaints, Plaintiffs alleged multiple intentional torts, including a claim that Dr. Khan intentionally inflicted emotional distress by "perform[ing] the unwanted

---

[33] Dr. Berry Dep. 119:12-20.

hysterectomy with malice, reckless indifference or wanton disregard." On January 5, 2018, the Court dismissed the intentional tort claims. Because Plaintiffs' intentional tort claims have been dismissed, any claims for punitive damages must now arise from their medical malpractice claims.

On September 5, 2018, Ms. Vick was deposed. Ms. Vick testified that she believes Dr. Khan "planned all of this" and that Dr. Khan stated on several occasions that Ms. Vick was the "perfect candidate" for a hysterectomy and that she (Dr. Khan) wanted to use this as a "teaching moment." Plaintiffs also allege that Dr. Khan forced Ms. Vick to sign the consent form prior to going into delivery by stating that she would "let the baby die inside Plaintiff if she did not sign the form."

18 *Del. C.* § 6855 addresses punitive damages in the context of medical negligence cases and states:

> In any action for medical negligence, punitive damages may be awarded only if it is found that the injury complained of was maliciously intended or was the result of willful or wanton misconduct by the health-care provider... Injuries shall not be considered maliciously intended in instances in which unforeseen damage or injury results from intended medication, manipulation, surgery, treatment or the intended omission thereof, administered or omitted without actual malice. . . .[34]

---

[34] 18 *Del. C.* § 6855.

In order to prevail on their claims for punitive damages, Plaintiffs must demonstrate sufficient facts creating a plausible inference that there was medical negligence with (1) actual malice on the part of the Khan Defendants or (2) willful or wanton misconduct by the Khan Defendants. Mere statements or allegations by Plaintiffs that the Khan Defendants were willful, wanton, or reckless, absent more, are insufficient to support a claim under Section 6855.

While the question of punitive damages is typically reserved for the trier of fact,[35] the evidence must first invite a reasonable inference that the defendant's conduct rose to the necessary level in order to warrant a punitive damages award.[36] Pursuant to Section 6855, "very high levels of inappropriate actions are required to warrant such a submission [of punitive damages to a jury]. Pursuant to this statute, a failure to show that a doctor acted with deliberate indifference to the patient's health precludes jury consideration of punitive damages."[37]

"[P]unitive damages serve a dual purpose – to punish wrongdoers and deter others from similar conduct."[38] Therefore, punitive damages may "be imposed only after a close examination of whether the defendant's conduct [was] 'outrageous,'

---

[35] *Carter v. Principe*, 2019 WL 193138, at *2 (Del. Super. Jan. 15, 2019); *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 527 (Del. 1987).

[36] *Solway v. Kent Diagnostic Radiology Associates, P.A.*, 2014 WL 703761, at *3 (Del. Super. Feb. 18, 2014) (citing *Jardel*, 523 A.2d at 527).

[37] *Hartman v. Orthopaedic Associates of Southern Delaware, P.A.*, 2015 WL 995767, at *4 (Del. Super. Feb. 27, 2015).

[38] *Id.* (citing *Jardel*, 523 A.2d at 529).

21

because of 'evil motive' or 'reckless indifference to the rights of others.'"[39] An award of punitive damages may not be granted for "[m]ere inadvertence, mistake or errors of judgment which constitute mere negligence. . . It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect."[40] The trier of fact may draw all reasonable inferences from the evidence to determine whether the alleged conduct by the defendants merits awarding punitive damages.[41]

The Court has reviewed the parties' submissions, as well as the evidence of record, and finds that Plaintiffs have not offered any factual support to warrant the submission of this case to a jury for the consideration of punitive damages. Plaintiffs' expert, Dr. Berry, has failed to identify a single act or omission demonstrating malicious intent, evil motive, willful or wanton misconduct, or a conscious disregard for Ms. Vick's well-being. Rather, the only evidence of record indicates that Dr. Khan was attempting to save Ms. Vick's life as she was hemorrhaging blood: (1) Dr. Berry testified that, in his opinion, Dr. Khan performed the hysterectomy for no other motivation than to stop Ms. Vick's post-partum hemorrhage;[42] (2) Dr. Berry stated that there was no evidence that Dr. Khan

---

[39] *Id.*
[40] *Id.*
[41] *Carter*, 2019 WL 193138, at *2; *Jardel*, 523 A.2d at 527.
[42] Dr. Berry Dep. 86:24-25; 87:1-3.

22

intentionally cut Ms. Vick's fibroids in order to perform the hysterectomy;[43] and (3) Dr. Berry testified that there was no evidence within the medical records to suggest that Dr. Khan wanted to perform the hysterectomy as a "teaching moment."[44] Indeed, Dr. Berry admitted that Dr. Khan was ". . . in a difficult position to potentially lose a patient life [sic] or perform a procedure that the patient is refusing."[45]

Dr. Berry has also raised the issue of "criminal battery," but has testified that the entire basis for such a claim would be the concept of lack of informed consent, which has already been addressed and rejected by this Court.[46] Therefore, the Court finds that there is no evidence demonstrating malicious intent or willful or wanton misconduct on the part of the Khan Defendants for a jury to consider. As such, the Court must grant the Khan Defendants' motion for partial summary judgment as to punitive damages.

### E. Bayhealth's Motion for Summary Judgment

Lastly, the Court will address Bayhealth's motion for summary judgment. Bayhealth lays out three arguments in its motion: (1) Plaintiffs cannot prove that an agency relationship existed between Dr. Khan and Bayhealth or establish that Dr.

---

[43] Dr. Berry Dep. 51:11-24 and 52:1-15.
[44] Dr. Berry Dep. 56:6-14.
[45] Dr. Berry Dep. 69:14-16.
[46] Dr. Berry Dep. 84:11-16; 85:9-25; 86:2-4.

Khan was acting as an agent and/or employee of Bayhealth; (2) Plaintiffs' claim as to lack of informed consent is not supported by competent expert medical opinion; and (3) Plaintiffs cannot prevail as to their claim for punitive damages. As the Court has already determined that Plaintiffs' informed consent claim fails, the Court need not address Bayhealth's second argument.

According to Bayhealth, Plaintiffs have provided no evidence that Bayhealth exercised control over Dr. Khan or that Dr. Khan is an employee or agent of Bayhealth. Bayhealth asserts that Dr. Khan is not an employee or agent of Bayhealth, but merely has privileges at Bayhealth, which is insufficient to establish an agency relationship, and therefore Bayhealth cannot be found vicariously liable for Dr. Khan's acts or omissions given the undisputed facts of record.

In opposition to Bayhealth's motion, Plaintiffs argue that Bayhealth held out Dr. Khan as an agent of the hospital and that Ms. Vick reasonably relied on that representation in seeking and obtaining treatment. Plaintiffs assert that Dr. Khan had an employee or agency relationship with Bayhealth and that Dr. Khan not only performed the procedures at Bayhealth's facilities, but also supervised and instructed others employed there. Plaintiffs argue that "[a]t the instructions of Dr. Khan, Bayhealth/Kent employees strapped Plaintiff's legs down to facilitate the unwanted procedure" and that employees of Bayhealth assisted Dr. Khan in the

acts and omissions involving Ms. Vick, including ignoring her pleas for help and injuring her when placing her back on the operating table.

Whether Bayhealth may be found liable for the allegedly negligent conduct of the Khan Defendants depends upon whether an actual agency or apparent agency relationship may be established between Dr. Khan and Bayhealth at the time of the alleged negligence.

Looking first to the issue of whether an actual agency relationship existed, the plaintiff must demonstrate that the employer/hospital controlled or had the right to control the conduct of the servant/physician in the performance of the servant/physician's work.[47] It is well settled in Delaware that general agency principles apply to hospitals and physicians.[48] "Where there is sufficient evidence establishing the requisite right of control, the trier of fact may find that the physician is an agent of the hospital and thus impose vicarious liability on the hospital."[49] "However, if the requisite right of control does not exist, the physician is considered an independent contractor and the hospital is generally not liable for the negligence of an independent contractor."[50] Thus, the level of control a hospital

---

[47] *Dunn v. Atlantic Surgical Associates, LLC*, 2007 WL 1784093, at *1 (Del. Super. Apr. 27, 2007) (citing *Fulton v. Quinn*, 1993 WL 19674, at *9 (Del. Super. Jan. 12, 1993)).
[48] *Id.*
[49] *Id.* at *9-10.
[50] *Id.* at *10.

exerts over a physician is a determinative factor with regard to a physician's classification.[51]

A basic tenet of agency law is that "[i]f the principal assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract, a master/servant type of agency relationship has been created."[52] In the instant case, the Court has not been presented with any facts to support the notion that Bayhealth controlled or had the right to control the conduct of Dr. Khan in the performance of her work. Plaintiffs have not provided any evidence that Dr. Khan maintained an office at Kent General Hospital or that she received a salary from Bayhealth. Moreover, Dr. Khan has testified that she is in private practice and does not have any other associates, nor does anyone have an interest or own shares in her business. Thus, there is no evidence to support an "actual agency" relationship.

While a hospital is generally not liable for the actions of physicians who are independent contractors, there is an exception to this rule. Under this exception, known as the "apparent agency" theory, a physician who is an independent contractor may, nonetheless, be considered an agent of the hospital with respect to

---

[51] *Id.*
[52] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997).

26

a patient.[53] The exception is very fact specific and has been articulated as follows: "One who represents that another is his servant or agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused [by] a lack of care or skill of the one appearing to be a servant or other agent as if he were such."[54]

In order to establish an "apparent agency" relationship between Dr. Khan and Bayhealth, the Plaintiffs must first establish that Bayhealth represented or held out Dr. Khan as an agent to Ms. Vick and, secondly, that Ms. Vick reasonably relied on that representation.[55] The burden is on the plaintiff to establish such a relationship, and the Court fails to see any evidence in the record to support this assertion.

As the Delaware Supreme Court explained in *Vanaman v. Milford Memorial Hospital, Inc.*,[56] there are two fact situations in which the law is clear surrounding an agency relationship in a medical malpractice suit:

> The first is this: a sick or injured person consults his own doctor for diagnosis and treatment; the doctor recommends hospital care; thereafter the doctor treats him in the hospital; the patient pays all expenses, including fees directly to the doctor. In this situation the law commonly regards the doctor as an

---

[53] *Fulton*, 1993 WL 19674, at *4 (citing *Vanaman*, 272 A.2d at 722).
[54] *Id.*; *see Restatement (Second) of Agency* § 267.
[55] *Dunn*, 2007 WL 1784093, at *3.
[56] 272 A.2d 718 (Del. 1970).

independent contractor in his relationship to the hospital and to the patient. The hospital is not liable for malpractice by the doctor.

The second, at the other end of the spectrum, is this: a sick or injured person is taken directly to a hospital; his problem is diagnosed and he is there treated by a doctor employed by the hospital (as an intern, resident, or in some other capacity). The hospital is liable for malpractice by that doctor under the doctrine of Respondeat superior [sic].[57]

In this case, Dr. Khan's relationship to Bayhealth clearly falls within the purview of the first scenario highlighted above. Bayhealth asserts that Ms. Vick had thirteen visits in Dr. Khan's office between December 2014 and June 2015, at which point Dr. Khan directed Ms. Vick to go from her office to be admitted to Kent General Hospital. Dr. Khan then treated Ms. Vick at Kent General Hospital, where Dr. Khan delivered Ms. Vick's child and provided postpartum surgical care. Plaintiffs have not provided any facts or evidence to the contrary. These facts demonstrate that Dr. Khan had privileges at Bayhealth, and was not acting as an agent or apparent agent of Bayhealth.

Dr. Berry's testimony also establishes that Plaintiffs have no viable claims against Bayhealth due to the actions of anyone *other* than Dr. Khan—*i.e.*, due to the actions of any actual or apparent agent of Bayhealth. When asked whether he would be offering an expert opinion at trial critical of "nursing or anyone other

---

[57] *Vanaman*, 272 A.2d at 720.

than Dr. Khan," Dr. Berry responded that any such opinion would be based on the allegation of lack of informed consent.[58] When asked whether he had any *other* criticisms of anyone other than Dr. Khan, Dr. Berry stated "[n]o."[59] This Court has already determined that Plaintiffs' informed consent claim fails because of the emergency situation faced by Dr. Khan (and by any hospital staff assisting her and helping to treat Ms. Vick). Therefore, Plaintiffs are unable to advance any medical malpractice claims against Bayhealth.

Finally, because Plaintiffs are unable to pursue any medical malpractice claims against Bayhealth, Plaintiffs' punitive damages claims against Bayhealth necessarily fall short as well. Accordingly, Bayhealth is entitled to judgment as a matter of law on all of Plaintiffs' claims against it.

## IV. CONCLUSION

**WHEREFORE**, for the foregoing reasons, (1) the Khan Defendants' and Plaintiffs' motions to strike are both **DENIED;** (2) the Khan Defendants' motion for partial summary judgment as to informed consent is **GRANTED,** and Plaintiffs' cross-motion for partial summary judgment on that issue is **DENIED;** (3) the Khan Defendants' motion for partial summary judgment on Plaintiffs' medical negligence claims regarding performance of the hysterectomy and the

---

[58] Dr. Berry Dep. 96:15-25.
[59] Dr. Berry Dep. 99:8-13.

episiotomy is **GRANTED;** (4) the Khan Defendants' motion for partial summary judgment on Plaintiffs' punitive damages claims is **GRANTED;** and (5) Bayhealth's motion for summary judgment is **GRANTED.**

**IT IS SO ORDERED.**

/s/ Noel Eason Primos
Judge

NEP/dsc
*Via File & ServeXpress and U.S. Mail*
oc:    Prothonotary